Steven R. Parminter (State Bar No. 090115)
Kathleen M. Bragg (State Bar No. 208890)
**WILSON, ELSER, MOSKOWITZ,**
**EDELMAN & DICKER LLP**
555 South Flower Street, Suite 2900
Los Angeles, California 90071
Telephone:   (213) 443-5100
Facsimile:   (213) 443-5101
Attorneys for DEFENDANT
OUTWARD BOUND, INC.

FILED

2008 JUN 23  PM 2: 59

CLERK U.S. DISTRICT COURT
CENTRAL DIST.C. CALIF
LOS ANGELES

BY _____

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

A. R._____, a minor by and
through his Guardian ad Litem,
TIMOTHY ROBERTS

                           Plaintiff,

v.

OUTWARD BOUND
WILDERNESS, INC.; OUTWARD
BOUND INTERNATIONAL, INC.
and DOES 1-100,

                           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.:

**CV08-04130 CAS (CWx)**

**NOTICE OF REMOVAL OF**
**ACTION UNDER 28 U.S.C.**
**§ 1441**

**[28 U.S.C. § 1332 (DIVERSITY OF**
**CITIZENSHIP)]**

Los Angeles County Superior Court
Case No. BC 389358

TO THE CLERK OF THE ABOVE-ENTITLED COURT:

         PLEASE TAKE NOTICE that Defendant OUTWARD BOUND, INC..

("Defendant") hereby removes to the United States District Court for the Central

District of California the state court action described below.

         1.     On or about  April 18, 2008, an action was commenced in the

Superior Court of California, in and for the County of Los Angeles, entitled

         A. R.        a Minor, by and through his Guardian ad Litem, Timothy

Roberts v. Outward Bound,  Inc.; Outward Bound International, Inc., Does 1

1

662465.1

through 100, as Case Number BC 389358.  A copy of the Complaint is attached hereto as Exhibit "A."

2.     Defendant Outward Bound, Inc. was served on May 13, 2008 via certified mail to Outward Bound, Inc.'s offices out of State.  Copies of the cover letter and envelope indicating U.S. Postmark of May 13, 2008 are attached hereto as Exhibit "B".   Therefore services by such mailing became effective 10 days later, May 23, 2008.

3.     This Notice of Removal is being filed within thirty (30) days after Defendant Outward Bound, Inc. was served with the Summons and Complaint in the State court action.

4.     Co-Defendant Outward Bound International was served on may 13, 2008 via certified mail out of State.  *See* Exhibit "B", penultimate page, Proof of Service indicating corporate offices of Outward Bound International are located in Draper, Utah.  Outward Bound International has consented to removal.  A true and correct copy of Outward Bound International's Joinder in this Notice of Removal is attached hereto as Exhibit "C".

5.     This is a civil action of which this District Court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this District Court pursuant to the provisions of 28 U.S.C. § 1441, in that it is a civil action between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs, because plaintiff alleges he suffered personal injuries, including the loss of his left foot and lower leg, and also seeks punitive damages for alleged gross negligence against Defendants.

6.     Defendant has met the requisite burden of proof of showing that the amount in controversy exceeds $75,000 by the following:

a.     It is facially apparent from the complaint that plaintiff is alleging damages in excess of $75,000 inasmuch as plaintiff's complaint at paragraph 1.J. states that as a result of the accident and failure to timely obtain appropriate medical and evacuation assistance, plaintiff suffered an amputation of his leg. *See*

2

NOTICE OF REMOVAL OF ACTION UNDER 28 USC § 1441

662465.1

*Fed. Pro. Before* § 2.664a (noting that claims of loss of limb likely exceed $75,000).

b.    As part of his treatment, plaintiff was hospitalized for at least three weeks, required surgery to remove his leg, subsequent rehabilitation, and prosthetic fitting, all of which likely resulted in medical costs well in excess of $75,000. *See* Declaration of Mickey Freeman, Exhibit "D" paragraph 6i.

c.    It is also facially apparent from the complaint that the amount in controversy exceeds $75,000 because the complaint alleges punitive damages. *See Fed. Pro. Before Trial* § 2.664a.

d.    On September 26, 2007, Plaintiff's counsel made a pre-litigation demand for settlement indicating his belief as to the value of the case being in the range of between $2 million to $8.5 million. *See* Declaration of Steven R. Parminter attached hereto as Exhibit "E".

e.    Defense counsel performed their own verdict and settlement search for leg amputations throughout the United States over the last twenty years. The verdicts and settlements ranged from $300,000 to $20,000,000, with most of the verdicts and settlements being in excess of $1 million. Of the 391 verdicts and settlements for leg amputations reviewed in which liability was found, not one was for less than $300,000. A sampling of the verdicts and settlements are attached hereto as Exhibit "F".

7.    Defendant Outward Bound, Inc. is informed and believes that plaintiff Austin Roberts was, at the time of the filing of this action, and still is, a citizen of the State of California. Defendant Outward Bound Inc. is a Delaware corporate with principal place of business located in New York. *See* Declaration of Mickey Freeman attached hereto as Exhibit "D", paragraph 2.

8.    The complaint herein also names as defendant Outward Bound International, Inc. Defendant Outward Bound International, Inc., at the time of the filing of the action and at present, is a New York corporation with principal place of business in Utah. *See* Declaration of Ian Wade, Exhibit "G".

662465.1

1      WHEREFORE, Defendant prays that this action be removed from the

2  Superior Court of California, County of Los Angeles, to the United States District

3  Court for the Central District of California.

4

5  Dated: June 23, 2008             WILSON, ELSER, MOSKOWITZ,
                                EDELMAN & DICKER LLP

6

7

8

9                          STEVEN R. PARMINTER

10                     KATHLEEN M. BRAGG
                        Attorneys for Petitioner

11                     Outward Bound, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

NOTICE OF REMOVAL OF ACTION UNDER 28 USC § 1441

662465.1

# EXHIBIT "A"

# SUMMONS
## (CITACION JUDICIAL)

**SUM-100**

**NOTICE TO DEFENDANT:**
**(AVISO AL DEMANDADO):**
OUTWARD BOUND, INC.; OUTWARD BOUND INTERNATIONAL,
INC.; and DOES 1 through 100,

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 2 4 2008

John A. Clarke, Executive Officer/Clerk
BY_____, Deputy
Elva S. Brown

**YOU ARE BEING SUED BY PLAINTIFF:**
**(LO ESTÁ DEMANDANDO EL DEMANDANTE):**
AUSTIN ROBERTS, a Minor, by and through his Guardian
ad Litem, TIMOTHY ROBERTS

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.
   There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

   Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.
   Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.

The name and address of the court is:
(El nombre y dirección de la corte es):
SUPERIOR COURT OF CALIFORNIA
111 N. Hill Street
Los Angeles, CA 90012-3014
CENTRAL DISTRICT

CASE NUMBER:
(Número del Caso): **BC389358**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
Matthew B.F. Biren                    (310) 476-3031
Biren / Katzman
11911 San Vicente Boulevard, Suite 140
West Los Angeles, CA 90049-6617

DATE:                          Clerk, by _____, Deputy
(Fecha)  APR 2 4 2008          (Secretario)              (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

**NOTICE TO THE PERSON SERVED:** You are served
1. [ ] as an individual defendant.
2. [ ] as the person sued under the fictitious name of (specify):

3. [ ] on behalf of (specify):

   under: [ ] CCP 416.10 (corporation)        [ ] CCP 416.60 (minor)
          [ ] CCP 416.20 (defunct corporation)  [ ] CCP 416.70 (conservatee)
          [ ] CCP 416.40 (association or partnership) [ ] CCP 416.90 (authorized person)
          [ ] other (specify):
4. [ ] by personal delivery on (date):

[SEAL]

Page 1 of 1

Matthew B.F. Biren, Esq., CSB #56565
Sarina M. Hinson, Esq., CSB #228255
Biren / Katzman
11911 San Vicente Boulevard, Suite 140
West Los Angeles, California 90049-6617
(310) 476-3031
Facsimile:  (310) 471-3165

Attorneys for Plaintiff
AUSTIN ROBERTS, a Minor etc.

CONFORMED COPY
OF ORIGINAL FILED
Los Angeles Superior Court

APR 18 2008

John A. Clarke, Executive Officer/Clerk

BY MARY GARCIA, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| AUSTIN ROBERTS, a Minor, by and through his Guardian ad Litem, TIMOTHY ROBERTS, <br><br> Plaintiff, <br><br> v. <br><br> OUTWARD BOUND, INC.; OUTWARD BOUND INTERNATIONAL, INC.; and DOES 1 through 100, <br><br> Defendants. | Case No:  BC389358 <br><br> COMPLAINT FOR PERSONAL INJURY DAMAGES AND REQUEST FOR JURY TRIAL |

Plaintiff alleges:

### PRELIMINARY ALLEGATIONS

#### Overview Allegations

1.      On July 6, 2006, after enrolling in Outward Bound's "Colorado Youth Adventures Backpacking and Climbing Course," 15 year old plaintiff, Austin Roberts, began the program filled with excitement.  However, due to Outward Bound having engaged in the following pattern and practice of conduct, fostering profits at the expense of properly training their people, Austin suffered an injury that was not only caused by the negligence of Outward Bound's staff, but due to the staffs' gross negligence once the injury occurred, he lost a leg:

///

1

BIREN | KATZMAN

A.    In 2002, Outward Bound hired a former head of a private equity fund to reverse declining revenue. His answer to the company's financial woes was a series of business mergers. While changes implemented by new management seemed to work – enrollment was up 13% by 2006 – the programs were mired in problems.

B.    As a result of the corporate desire to chase revenue and maximize profits at the expense of training and customer safety, the company hired younger instructors with less experience and provided them with inadequate training to lead children on these Outward Bound programs. In fact, in the year 2006, Outward Bound had no safety quality training director. The result – a slew of accidents including Austin's; including a fatality (a Boston girl who died the day after Austin's accident) and numerous other injuries, resulting from mountaineering, falls, drowning and hypothermia; not to mention countless near misses.

C.    Austin's nightmare began on July 13, 2006, when he and other children in his group climbed a portion of Mount Holy Cross in Colorado. On July 14, 2006, the group completed their ascent to the Mountain's summit. Shortly after noon, they began their descent. For whatever reason, the young Outward Bound instructors decided to bypass the original ascent route and instead instructed the children to descend the Mountain on a very steep, un-traveled route. At the steepest point of the descent, the Outward Bound instructors realized that the children would have difficulty completing the descent while lugging their gear. They told the children to leave their backpacks and continue their descent.

D.    After the children arrived at lower terrain, the instructors left the children unattended and proceeded back up the mountain to retrieve the children' backpacks. While retrieving the backpacks, one of the Outward Bound instructors carelessly dislodged a large microwave oven-sized rock.

E.    Austin and the other children were resting directly below where the instructors were climbing. By leaving the children in the group unattended in an area at the foot of a cliff—an area that constitutes a rock fall danger zone – while the instructors were going to be hiking directly above them, Outward Bound's instructors grossly and unnecessarily increased the risks inherent in wilderness hiking.

2

BIREN | KATZMAN

F.   The large rock fell on Austin's leg, causing massive injuries, including severely compounded breaks of the tibia and fibula bones, as well as ruptured major arteries. Austin's leg was bleeding profusely.

G.   Improperly trained, the Outward Bound instructors failed to recognize and communicate the severity and emergent nature of Austin's injury to either Outward Bound administrative staff or to search and rescue teams.   (They never removed his boot where the injury had occurred until after search and rescue had arrived).  As a result, normal medical evacuation was implemented rather than emergency medical evacuation.

H.   Upon arrival to the accident site, the Vail Medical Rescue Group determined that Austin's injuries were far more severe than Outward Bound had initially reported.

I.   Due to the severity of his injuries, Austin would have to be evacuated out of the mountain by helicopter at first light.  He was finally air lifted from the mountain approximately 12 hours after he was first injured.

J.   Had Austin been timely evacuated and received timely competent medical care, his injuries could have been successfully treated without amputation of his leg. However, as a direct result of Outward Bound's failure to timely obtain appropriate medical and evacuation assistance, Austin did not receive competent medical attention for more than twelve hours after the accident, resulting in his leg having to be amputated; a totally unnecessary tragedy

**General Allegations**

2.   Plaintiff Austin Roberts, who is a minor, brings this action through his Guardian Ad Litem, Timothy Roberts.

3.   At all relevant times, defendant Outward Bound, Inc. ("OB") was a corporation doing business in the State of California.

4.   At all relevant times, defendant Outward Bound International, Inc. ("OBI") was the umbrella service organization for Outward Bound worldwide.  A Council with

BIREN | KATZMAN

3

1   representatives from each licensed member school, including OB, governs OBI.  The purpose

2   of OBI is to ensure that safety and quality standards are met in all Outward Bound schools,

3   including OB.  (For facility, defendants OB and OBI will be collectively referred to as "OB"

4   or "Defendants").

5       5.      The true names and capacities of Does 1 through 100, inclusive, are currently

6   unknown to Plaintiff who, therefore, sues said defendants by fictitious names.

7       6.      At all relevant times, each of the defendants was the agent or employee of each

8   of the remaining defendants and was acting within the course and scope of said agency and

9   employment.

10

11  **Documentation Allegations**

12      7.      Prior to Plaintiff's participation in the OB program, Plaintiff and his father, Plaintiff and his father,

13  Timothy Roberts, were required to complete and sign several contract documents, which

14  were contained in a large packet entitled *Level III Activity, Participant Packet* (hereafter "the

15  Participant Packet").  OB e-mailed the documents to Plaintiff and his father, who received

16  them in California.  (The documents were also later mailed, but the ones reviewed and

17  executed by Plaintiff and his father were the e-mailed set.)  A copy of the Participant Packet

18  is attached as Exhibit 1 and incorporated herein by reference.

19      8.      OB expressly advised Plaintiff and his father that enrollment in the program

20  was not only contingent upon the completion and execution by both Plaintiff and his father of

21  all forms in the Participant Packet, but also that final acceptance into the program is

22  contingent upon parent and child reviewing the materials" provided by OB

23      9.      By requiring that parents read through all of the provided materials and then

24  expressly consent to their child's participation in the program, OB was effectively inviting

25  the parents to rely upon the representations and information contained within the

26  documentation in making the decision whether or not to consent to their child's participation.

27      10.     The Participant Packet contained 12 pages, consisting of the following forms,

28  which were titled in large blue font:

BIREN | KATZMAN

4

1      A.    *Participant Medical Record* (4 pages);

2      B.    *Participant Questionnaire* (1 page);

3      C.    *Commitment to Excellence* (1 page);

4      D.    *Parent Questionnaire* (2 pages); and,

5      E.    *Cancellation/Withdrawal Protection Plan* (4 pages).

6      11.    The print format of the *Cancellation/Withdrawal Protection Plan* is extremely

7 confusing.

8      A.    The first three pages of the *Cancellation/Withdrawal Protection Plan* 4

9 page packet (pages 9-11 of the Participant Packet) are each entitled *Cancellation/Withdrawal*

10 *Protection Plan RETURN*.

11      B.    The fourth page has no title.

12      C.    Signatures are required on both the second and fourth pages

13      D.    Beneath the title on page 3 of the *Cancellation/Withdrawal Protection*

14 *Plan* is a subheading, in a black type font considerably smaller (less than half the size) than

15 that used on the previous pages (and barely larger than the black text font that followed).

16 This subheading read: "*Outward Bound Participant Acknowledgment And Assumption Of*

17 *Risks and Release And Indemnity* Agreement." (This page is hereafter referred to generically

18 as "the Release".)

19      12.    The Release contained, *inter alia*, the following relevant provisions:

20      A.    Under a sub-sub heading entitled *Release and Indemnity Agreement* – in

21 a type font smaller than any of the text of the document – A waiver of any and all claims for

22 negligence, but not gross negligence, against OB. (This provision is hereafter referred to as

23 "the Indemnity Agreement".)

24      B.    On the back of the page, under a sub-sub heading entitled *Additional*

25 *Provisions*, a provision that Colorado law would govern any claim against OB regardless of

26 conflict of law rules and a requirement that any suit against OB be filed in Colorado. (This

27 provision is hereafter referred to as "the Colorado Provision".)

28      13.    The Release was not clear and conspicuous and is therefore invalid in its

MBFB:sb1:4/2007-254
F#05950     *COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL*

BIREN | KATZMAN

1  entirety.

2          A.      The Indemnity Agreement was not clear and conspicuous and is

3  therefore invalid.

4          B.      The Colorado Provision was not clear and conspicuous and is therefore

5  invalid.

6          14.     When Plaintiff and his father signed the Participant Packet on June 6, 2006,

7  neither of them was aware of the Indemnity Agreement or Colorado Provision, as this

8  information was buried in the boilerplate language of the Participant Packet.

9

10  **Accident Allegations**

11         15.     Plaintiff was a participant in OB's *Colorado Youth Adventures Backpacking*

12  *and Climbing* course number CEY644, which began on July 6, 2006.

13         16.     Plaintiff was assigned to a group that included several other OB children and

14  two instructors (hereafter "the Group").

15         17.     On July 13, 2006 the Group climbed a portion of Mount of the Holy Cross in

16  Colorado ("the Mountain").

17         18.     On July 14, 2006, the group completed its ascent to the Mountain's summit.

18  Shortly after noon, they began their descent.

19         19.     The OB instructors decided to bypass the original ascent route and instead

20  instructed the children to descend the Mountain on a very steep, untraveled route.

21         20.     At the steepest portion of the descent, the OB instructors realized that the

22  children would have difficulty completing the descent while lugging their gear.  They told the

23  children to leave their backpacks and continue their descent.

24         21.     After the children arrived at lower terrain, the instructors left the children

25  unattended and proceeded back up the mountain to retrieve the children' backpacks.

26         22.     While retrieving the backpacks, one of the OB instructors carelessly dislodged

27  a large microwave oven-sized rock.

28         23.     Plaintiff and other children were resting directly below where the instructors

6

BIREN | KATZMAN

1    were climbing.

2        24.    The large rock fell on Plaintiff's leg, causing massive injuries including

3    severely compounded breaks of the tibia and fibula bones, as well as ruptured major arteries.

4    Plaintiff's leg was bleeding profusely.

5        25.    The OB instructors failed to recognize and communicate the severity of

6    Plaintiff's injury to search and rescue teams.  As a result, normal medical evacuation was

7    implemented rather than emergency medical evacuation.

8        26.    Upon arrival to the accident site, the Vail Medical Rescue Group determined

9    that Plaintiff's injuries were far more severe than OB had initially reported.  Due to the

10   severity of his injuries, Plaintiff would have to be evacuated out of the mountain by

11   helicopter at first light.  Plaintiff was finally air lifted from the mountain approximately 12

12   hours after he was first injured.

13       27.    OB's instructors failed to appreciate or communicate to OB's administrative

14   staff the severity and emergent nature of Plaintiff's injuries.

15       28.    OB's administrative staff failed to make appropriate inquiry of the instructors,

16   which inquiry would have disclosed the emergent nature of Plaintiff's injuries.

17       29.    OB's administrative staff failed to communicate the emergent nature of

18   Plaintiff's injuries to search and rescue personnel.

19       30.    Had Plaintiff been timely evacuated and received timely competent medical

20   care, his injuries could have been successfully treated.

21       31.    As a direct result of OB's failure to timely obtain appropriate medical and

22   evacuation assistance, Plaintiff did not receive competent medical attention for more than

23   twelve hours after the accident, resulting in his leg having to be amputated.

24   ///

25   ///

26   ///

27   ///

28   ///

BIREN | KATZMAN

7

## FIRST CAUSE OF ACTION AGAINST ALL
## DEFENDANTS AND DOES 1 THROUGH 100 FOR
## NEGLIGENCE

32.    Plaintiff realleges paragraphs 1 through 31 of the Preliminary Allegations and incorporates the same herein by reference.

33.    Defendants had a duty to supervise Plaintiff.

34.    Defendants had a duty not to engage in any conduct which would increase the risks inherent in wilderness hiking.

35.    By leaving the children in the group unattended in an area at the foot of a cliff – an area that constitutes a rock fall danger zone – while the instructors were going to be hiking directly above them, OB's instructors grossly and unnecessarily increased the risks inherent in wilderness hiking.

36.    Defendants' conduct, including but not limited to that specifically alleged above, constitutes negligence.

37.    Defendants' negligence caused the accident in which Plaintiff was injured.

38.    As a result of the conduct of defendants, Plaintiff sustained personal physical injuries, which have caused Plaintiff pain and suffering entitling Plaintiff to general damages, as will be established at the time of trial.

39.    As a result of the conduct of defendants, Plaintiff has incurred, and will continue to incur in the future, expenses and obligations resulting from the treatment of the personal physical injuries Plaintiff sustained, to Plaintiff's damage, as will be established at the time of trial.

40.    As a result of the conduct of defendants, Plaintiff will be unable to participate in occupations that he would otherwise have been able to participate in, resulting in a loss of future earnings capacity, to Plaintiff's damage, as will be established at the time of trial.

///

///

///

BIREN | KATZMAN

8

BIREN | KATZMAN

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 100 FOR GROSS NEGLIGENCE

41.     Plaintiff realleges paragraphs 1 through 31 of the Preliminary Allegations and incorporates the same herein by reference.

42.     Defendants had a duty to provide reasonable medical care for participants in its programs.

43.     Defendants had a duty not to engage in any conduct which would increase the risks inherent in wilderness hiking.

44.     By failing to communicate the emergent nature of Plaintiff's injuries and arrange for immediate evacuation so that Plaintiff could receive timely medical care from specialists, defendants breached their duty to provide reasonable medical care.

45.     Defendants' negligence grossly and unnecessarily increased the risks inherent in wilderness hiking.

46.     Defendants conduct, including but not limited to that specifically alleged above, constitutes gross negligence.

47.     Defendants' gross negligence caused Plaintiff's injuries to be far more severe than they would have been had he received timely and appropriate medical care.

48.     Plaintiff realleges the damage allegations set forth in paragraphs 37 through 39 of the First Cause of Action and incorporates the same herein by reference.

## THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 100 FOR GROSS NEGLIGENCE

49.     Plaintiff realleges paragraphs 1 through 31 of the Preliminary Allegations, paragraphs 33 through 37 of the First Cause of Action and paragraphs 42 through 47 of the Second Cause of Action and incorporates the same herein by reference.

///

9

50.     Between 1998 and 2000, OB implemented the Pacific Crest Outward Bound School ("PCOBS") training curriculum; a training curriculum so rigorous and effective that it was recognized by the wilderness-risk management program as being exemplary.

51.     Between 1991 and 2002, OB's revenue began to steeply decline.

52.     In 2002, OB hired John Read – a Harvard M.B.A. and former head of a private equity fund – to fix OB's financial problems.

53.     Between 2003 and June 2006, OB vastly increased the number of programs it conducted in an effort to increase revenue.

54.     During this same time, in an effort to decrease costs, OB intentionally started hiring less qualified instructors and provided them with significantly less safety training than the PCOBS curriculum had previously utilized.

55.     OB knew, or reasonably should have known, that the combination of more programs with fewer, less qualified instructors would vastly increase the risks to program participants.

56.     As a result of OB's conduct, the instructors in charge of the group were not qualified or properly trained to recognize the severity of Plaintiff's injuries and the emergent need for evacuation and specialized medical care.

57.     OB's conduct, including but not limited to that specifically alleged above, constitutes gross negligence.

58.     Plaintiff realleges the damage allegations set forth in paragraphs 37 through 39 of the First Cause of Action and incorporates the same herein by reference.

59.     Defendants' conduct was despicable and constituted malice and oppression, entitling Plaintiff to recover exemplary damages from said defendants, under Civil Code § 3294, in that the conduct was carried on by the defendants with a willful and conscious disregard of the rights and safety of others, including but not limited to the Plaintiff.

A.      Officers, directors and/or managing agents of defendants OB had actual knowledge that the practices alleged were extremely dangerous and nevertheless authorized and/or ratified the practices with conscious disregard of the rights and safety of those human

BIREN | KATZMAN

1  beings who could potentially suffer substantial personal injury or death as a result of the

2  practices.

3

4           **FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**

5           **AND DOES 1 THROUGH 100 FOR INTENTIONAL**

6           **MISREPRESENTATION**

7           59.     Plaintiff realleges paragraphs 1 through 31 of the Preliminary Allegations,

8  paragraphs 33 through 37 of the First Cause of Action, paragraphs 42 through 47 of the

9  Second Cause of Action and paragraphs 50 through 57 of the Third Cause of Action, and

10  incorporates the same herein by reference.

11          60.     Defendants assigned a representative to communicate with Austin and his

12  family and to answer any questions prior to the commencement of the program.  The

13  individual assigned to Austin and his family represented to Austin's father, Tim Roberts,

14  before he signed the contract documents, that all instructors who would lead Austin during

15  his trip would be experienced, not only as Outward Bound Instructors in general, but

16  specifically with respect to the route in question which Austin's group would be taking.  This

17  representation was even more specific than the more general representations contained in the

18  Participation Packet and other documents sent by defendants to Austin and his family, as well

19  on defendants' websites.

20          61.     At the time the defendants' representative made these representations regarding

21  the level of experience of the instructors and their familiarity with the particular route upon

22  which the students would be traveling, she knew them to be false and/or made these

23  representations with reckless disregard for their veracity.

24          62.     The intended objective and purpose of these representations was to induce

25  Austin and his family to consent to Austin's participation in the program.

26          63.     In direct and reasonable reliance on these statements regarding the significant

27  level of experience of the instructors, Austin and his family decided that he would be allowed

28  to participate in the program.

11

MBFB:sh1:4/2007-254
F#05950    *COMPLAINT FOR DAMAGES AND REQUEST FOR JURY TRIAL*

64.     Had Plaintiff and his family known that the instructors who would guide Austin on the program were not experienced and had never even been on the route that Austin's group would be taking, Austin and his parents never would have consented to his participation in the program.

64.     As a direct result of the reliance on these representations by Plaintiff and his parents, Plaintiff was allowed to participate in the program and ultimately he sustained horrific injuries, losing his leg.

65.     Plaintiff realleges the damage allegations set forth in paragraphs 38 through 40 of the First Cause of Action and incorporates the same herein by reference.

66.     Defendants' conduct was despicable and constituted malice and oppression, entitling Plaintiff to recover exemplary damages from said defendants, under Civil Code § 3294, in that the conduct was carried on by the defendants with a willful and conscious disregard of the rights and safety of others, including but not limited to the Plaintiff.

A.     Officers, directors and/or managing agents of defendants OB had actual knowledge that the practices alleged were extremely dangerous and nevertheless authorized and/or ratified the practices with conscious disregard of the rights and safety of those human beings who could potentially suffer substantial personal injury or death as a result of the practices.

## FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 100 FOR BREACH OF CONTRACT

67.     Plaintiff realleges paragraphs 1 through 31 of the Preliminary Allegations, paragraphs 32 through 37 of the First Cause of Action, paragraphs 42 through 47 of the Second Cause of Action, paragraphs 50 through 57 of the Third Cause of Action, and paragraphs 61 through 65 of the Fourth Cause of Action, and incorporates the same herein by reference.

68.     Plaintiff, with his father's consent, and OB entered into a contract as described in paragraphs 7 through 14 of the documentary allegations.

12

BIREN | KATZMAN

69. Plaintiff did all, or substantially all, of the significant things that the contract required him to do.

70. All conditions required by the contract for performance had occurred prior to the time of the accident, including Plaintiff's preparation for the program, signature and return of all required forms, and review of all materials required by OB for acceptance.

71. OB failed to provide experienced instructors as required by the contract. In addition, OB failed to provide an instructor/student ratio of at least 1:5 as required by the contract.

72. Plaintiff was harmed by OB's failure to provide experienced and sufficient instructors on the program and lost his leg.

73. Plaintiff realleges the damage allegations set forth in paragraphs 38 through 40 of the First Cause of Action and incorporates the same herein by reference.

WHEREFORE, Plaintiff prays for judgment against defendants as follows:

1. General damages, as established at the time of trial;

2. Special damages, as established at the time of trial;

3. Punitive damages, as established at the time of trial (as to Third and Fourth Causes of Action only); and

4. Cost of suit and such other further relief as the Court deems appropriate.

DATED: March 25, 2008        BIREN / KATZMAN

By: _____
MATTHEW B.F. BIREN
Attorneys for Plaintiff
AUSTIN ROBERTS, a Minor etc.

13

BIREN | KATZMAN

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby requests a trial by jury.

DATED: March 25, 2008          BIREN / KATZMAN

By: _____
     MATTHEW B.F. BIREN
     Attorneys for Plaintiff
     AUSTIN ROBERTS, a Minor etc.

BIREN | KATZMAN

14

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Matthew B.F. Biren<br>Biren / Katzman<br>11911 San Vicente Boulevard, Suite 140<br>West Los Angeles, CA  90049-6617<br><br>TELEPHONE NO.: (310) 476-3031   FAX NO.: (310) 471-3165<br>ATTORNEY FOR *(Name):* AUSTIN ROBERTS, a minor | **CONFORMED COPY**<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>APR 18 2008<br><br>John A. Clarke, Executive Officer/Clerk<br>BY MARY GARCIA, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 N. Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, CA  90012-3014
BRANCH NAME: CENTRAL DISTRICT

CASE NAME: ROBERTS v. OUTWARD BOUND

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: |
|---|---|---|
| [X] Unlimited   [ ] Limited<br>(Amount       (Amount<br>demanded      demanded is<br>exceeds $25,000)  $25,000 or less) | [ ] Counter   [ ] Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | BC389358<br><br>JUDGE:<br>DEPT: BC389358 |

*Items 1-6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

| Auto Tort | Contract | Provisionally Complex Civil Litigation |
|---|---|---|
| [ ] Auto (22) | [ ] Breach of contract/warranty (06) | **(Cal. Rules of Court, rules 3.400-3.403)** |
| [ ] Uninsured motorist (46) | [ ] Rule 3.740 collections (09) | [ ] Antitrust/Trade regulation (03) |
| **Other PI/PD/WD (Personal Injury/Property** | [ ] Other collections (09) | [ ] Construction defect (10) |
| **Damage/Wrongful Death) Tort** | [ ] Insurance coverage (18) | [ ] Mass tort (40) |
| [ ] Asbestos (04) | [X] Other contract (37) | [ ] Securities litigation (28) |
| [ ] Product liability (24) | **Real Property** | [ ] Environmental/Toxic tort (30) |
| [ ] Medical malpractice (45) | [ ] Eminent domain/Inverse | [ ] Insurance coverage claims arising from the |
| [ ] Other PI/PD/WD (23) | condemnation (14) | above listed provisionally complex case |
| **Non-PI/PD/WD (Other) Tort** | [ ] Wrongful eviction (33) | types (41) |
| [ ] Business tort/unfair business practice (07) | [ ] Other real property (26) | **Enforcement of Judgment** |
| [ ] Civil rights (08) | **Unlawful Detainer** | [ ] Enforcement of judgment (20) |
| [ ] Defamation (13) | [ ] Commercial (31) | **Miscellaneous Civil Complaint** |
| [ ] Fraud (16) | [ ] Residential (32) | [ ] RICO (27) |
| [ ] Intellectual property (19) | [ ] Drugs (38) | [ ] Other complaint *(not specified above)* (42) |
| [ ] Professional negligence (25) | **Judicial Review** | **Miscellaneous Civil Petition** |
| [ ] Other non-PI/PD/WD tort (35) | [ ] Asset forfeiture (05) | [ ] Partnership and corporate governance (21) |
| **Employment** | [ ] Petition re: arbitration award (11) | [ ] Other petition *(not specified above)* (43) |
| [ ] Wrongful termination (36) | [ ] Writ of mandate (02) | |
| [ ] Other employment (15) | [ ] Other judicial review (39) | |

2. This case [ ] is  [X] is not  complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. [ ] Large number of separately represented parties     d. [ ] Large number of witnesses
   b. [ ] Extensive motion practice raising difficult or novel     e. [ ] Coordination with related actions pending in one or more courts
          issues that will be time-consuming to resolve           in other counties, states, or countries, or in a federal court
   c. [ ] Substantial amount of documentary evidence     f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. [X] monetary  b. [ ] nonmonetary; declaratory or injunctive relief  c. [X] punitive

4. Number of causes of action *(specify):* FIVE

5. This case [ ] is  [X] is not  a class action suit.

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: April 15, 2008

Matthew B.F. Biren                                          ▶
_____                              _____
(TYPE OR PRINT NAME)                                        (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

| Form Adopted for Mandatory Use<br>Judicial Council of California<br>CM-010 [Rev. July 1, 2007] | **CIVIL CASE COVER SHEET** | Legal<br>Solutions<br>& Plus | Cal. Rules of Court, rules 2.30, 3.220, 3.400-3.403, 3.740;<br>Cal. Standards of Judicial Administration, std. 3.10 |

# EXHIBIT "B"



**MATTHEW B. F. BIREN   MARC J. KATZMAN   DEBRA J. TAUGER   SARINA M. HINSON   DENNIS S. NEWITT**

May 13, 2008

**CERTIFIED MAIL,
RETURN RECEIPT REQUESTED**

Mickey Freeman
Chief Operating Officer
Outward Bound, Inc.
100 Mystery Point Road
Garrison, NY 10524-9757

Re:   *Roberts v. Outward Bound, Inc.; Outward Bound International, Inc.*
         Our File No. F05950

Dear Mr. Freeman:

Enclosed please find the following documents in the above-captioned matter:

1.   Summons and Complaint
2.   Civil Case Cover Sheet
3.   Civil Case Cover Sheet Addendum and Statement of Location
4.   Application and Order for Appointment of Guardian ad Litem-Civil for Austin Roberts
5.   Notice of Case Assignment
6.   Notice of Related Case
7.   Alternative Dispute Resolution (ADR) Information Package

You are being served as a defendant in the above-captioned matter.

Pursuant to the provisions of Section 415.40 of the California Code of Civil Procedure, because you are being served outside the State of California, the service is effective by merely mailing a copy of the Summons and Complaint – as is being done here – by certified mail, return receipt requested.  Pursuant to the provisions of this statute, the service of Summons becomes effective on the tenth (10th) day after mailing; in other words, the service becomes effective ten (10) days from the date of this letter.

11911 SAN VICENTE BOULEVARD, SUITE 140 · WEST LOS ANGELES, CALIFORNIA 90049-6617
310.476.3031 | 800.973.4969 | FAX 310.471.3165 | BIRENKATZMAN@BIREN.COM | WWW.BIREN.COM



Mickey Freeman
May 13, 2008
Page 2


Pursuant to California law, you have thirty (30) days from the effective date of the service of the Summons to file a responsive pleading; in other words, you have forty (40) days from the date of this letter. If you fail to file a responsive pleading during this time, or to arrange for an extension of the time to file a responsive pleading, a default can be taken against you and a default judgment entered.

I suggest that you immediately turn this matter over to the insurance carrier who insured you at the time of the accident referred to in the Complaint. If you were uninsured at the time of the accident, please contact my office so that we can discuss the alternative ways you may proceed.

If you have any questions, please do not hesitate to contact me. As implied above, this matter requires your urgent attention.

Very truly yours,

BIREN / KATZMAN

Matthew B.F. Biren

Enclosures

MBFB:pws:5/2008-94
F#05950



CERTIFIED MAIL

7006 2760 0002 9244 7851

**BIREN | KATZMAN**
TRIAL LAWYERS

11911 SAN VICENTE BOULEVARD SUITE 140
BRENTWOOD, CALIFORNIA 90049-6617

CERTIFIED MAIL RETURN RECEIPT REQUESTED

Mickey Freeman
Chief Operating Officer
Outward Bound, Inc.
100 Mystery Point Road
Garrison, NY 10524-9757

5950

# EXHIBIT "C"

1  Laura L. Horton, SBN 158990
   Patrick Bollig, SBN 248255
2  **HORTON & DEBOLT LLP**
   9301 Oakdale Avenue, Suite 220
3  Chatsworth, California 91311-6515
   Telephone: (818) 407-0700
4  Facsimile: (818) 407-0705
   e-mail: laura@horton-debolt.com
5
   Attorneys for Specially Appearing Defendant
6  Outward Bound International, Inc.

7

8

9              **UNITED STATES DISTRICT COURT**

10            **CENTRAL DISTRICT OF CALIFORNIA**

11
                                          No. CV08-D4130 CAS (CWX)
12  AUSTIN ROBERTS, a Minor, by and
    through his Guardian ad Litem, TIMOTHY
13  ROBERTS,                              Los Angeles County Superior Court,
                                          Case No. BC389358
14            Plaintiff,                  [Complaint filed on April 18, 2008]
                                          Related Case No. EC045248
15       v.                               [Complaint filed on July 12, 2007, dismissed w/o prejudice
                                          January 11, 2008]
16  OUTWARD BOUND WILDERNESS,
    INC.; OUTWARD BOUND              **JOINDER IN NOTICE OF REMOVAL**
17  INTERNATIONAL, INC.; and DOES 1  **OF ACTION**
    through 100,
18
              Defendants.
19

20       Defendant Outward Bound International, Inc., specially appearing, hereby joins in

21  Outward Bound Wilderness, Inc.'s Notice of Removal to this Court of the state court action

22  described in the said Notice of Removal.  Outward Bound International, Inc. expressly reserves all

23  rights it may have to challenge personal jurisdiction and validity of service.

24
    Dated: June 20, 2008
25                                        **HORTON & DEBOLT LLP**

26                                        *Laura Y Horton*

27                                   By:_____
                                          Laura L. Horton
28                                        Patrick G. Bollig
                                          Attorneys for Specially appearing defendant,
                                          Outward Bound International, Inc.

HORTON & DEBOLT LLP
9301 OAKDALE AVENUE, SUITE 220
CHATSWORTH, CA 91311
TEL. (818) 407-0700

# EXHIBIT "D"

## DECLARATION OF MICHAEL FREEMAN

I, Michael Freeman, declare:

1.      I am the Chief Operating Officer for Outward Bound Inc., a company also sometimes referred to as "Outward Bound USA" to distinguish it from similar companies licensed to operate in other countries around the world.   Prior to the Austin Roberts accident in July 2006, I was the President of Outward Bound Wilderness, a division of Outward Bound Inc.  In my position as President of Outward Bound Wilderness, I was personally involved in overseeing that the emergency response protocols were being followed and communicating with the family about the incident.  I have reviewed the information available to our company regarding the Austin Roberts accident.   Except as identified in this declaration as coming from other sources, the information stated herein is based upon my personal knowledge or my review of available information and if called upon as a witness I could and would testify competently to the following:

2.      Outward Bound Inc. (hereinafter "Outward Bound") was incorporated in the state of Delaware and its corporate headquarters are located at 100 Mystery Point Road, Garrison, New York.

3.      Outward Bound Inc. is a non-profit educational organization with five core programs intended and designed to change lives, build teams and transform schools by presenting challenges and adventure in the wilderness, urban settings, workrooms and classrooms. The five core programs were: (1) Outward Bound Wilderness, (2) Expeditionary Learning Schools Outward Bound, (3) Outward Bound Professional, (4) Outward Bound Urban Centers and (5) Outward Bound Discovery. Each of those five core programs operates as a separate division of Outward Bound.  In fall 2007, these five core programs were integrated into three: 1) "Expeditions" (inclusive of the former Outward Bound Wilderness, Outward

1

1    Bound Discovery and Outward Bound Professional), 2) Outward Bound Centers,

2    and 3) Expeditionary Learning Schools.

3        4.    The particular course in which Austin Roberts enrolled, "CEY644

4    Colorado Backpacking & Climbing – Youth Adventure," operated from the former

5    Outward Bound Wilderness office in Leadville, Colorado.

6        5.    Based upon my personal knowledge, my discussions with involved

7    individuals and my review of relevant documents, individuals employed by or

8    affiliated with Outward Bound who were involved in the planning, organization,

9    hiring and training of the instructors who lead this course or who were involved in

10   the rescue, transport and treatment of Austin Roberts after his accident in the

11   Colorado Rocky Mountains include but are not necessarily limited to:

12

13   a)  Michael Lindsey, Vice President of Safety for Outward Bound Wilderness

14       and a resident of Colorado.

15   b)  James Harris, Lead Instructor on the subject course, an employee of

16

17       Outward Bound Wilderness and a resident of Montana.

18   c)  Jennifer Kauffman, Instructor on the subject course, an employee of

19

20       Outward Bound Wilderness and a resident of Colorado.

21   d)  Kendra Kurihara, former Group Programs Director for Outward Bound

22       Wilderness, based in Leadville, Colorado and a resident of Colorado.

23

24   e)  Vahe Derounian, Outward Bound Wilderness CEY644 Course Director and

25       a resident of Colorado, who also lead the Outward Bound support team that

26       traveled to the accident site to assist the Vail Mountain Rescue Group

27

28

669162.1

(VMRG) with carrying gear and transporting Austin Roberts from the accident site to a location where he could be evacuated by helicopter.

f)  Scott Massey, an Outward Bound Wilderness Course Director and Instructor who was a member of the Outward Bound support team that went to the accident site to assist VMRG and who is a Colorado resident.

g)  Simon Fox, an Outward Bound Wilderness Instructor who was a member of the Outward Bound support team that went to the accident site to assist VMRG and who is a Colorado resident.

h)  An Outward Bound Wilderness logistics employee who was a member of the Outward Bound support team that went to the accident site to assist VMRG and who is a Colorado resident.

6.  Based upon my personal knowledge, my discussions with involved individuals and my review of relevant documents, individuals and entities not part of nor directly affiliated with Outward Bound who were involved in the rescue, transport and treatment of Austin Roberts after his accident in the Colorado Rocky Mountains include but are not necessarily limited to:

a)  Vail Mountain Rescue Group (VMRG), headquartered in Vail, Colorado, which ultimately directed and controlled Austin Roberts' post-accident transport and evacuation in co-ordination with the Eagle County Sheriffs Office.

b) Tim Cochrane, VMRG Operations Leader, who was involved in discussions and decisions regarding the Austin Roberts evacuation, including best approach for search and rescue teams to the accident site and is believed to have assisted in the determination of the ability to perform a helicopter evacuation before sunset on the day of the accident. Mr. Cochrane is believed to be a resident of Colorado.

c) Steve Zuckerman, President of VMRG and the on-site VMRG Incident Commander, who also is believed to have assisted in the determination of the ability to perform a helicopter evacuation of Austin Roberts before sunset on the day of the accident, then led the VMRG personnel to the accident site. Mr. Zuckerman is believed to be a resident of Colorado.

d) Eagle County Sheriffs Office, located in Eagle County, Colorado. This office acted as the coordination center for search and rescue operations, including all requests for helicopter rescue.

e) Flight For Life Colorado, the office located in Frisco, Colorado, is the organization which evacuated Austin Roberts by helicopter from the Rocky Mountains to the hospital in Vail Valley, Colorado. Other than Gary Droder, below, it is not presently known how many persons from this organization may have some involvement with the facts of this incident.

f) Gary Droder, the Flight For Life Colorado helicopter pilot who is believed to have been involved in both the planning of the helicopter evacuation, the

4

DECLARATION OF MICHAEL FREEMAN

669162.1

selection of the evacuation landing zone and the actual helicopter transport of Austin Roberts.  Mr. Droder is believed to be a Colorado resident.

g) Vail Valley Medical Center, Vail, Colorado, whose employees provided radio advice on the treatment of Austin Roberts at the accident scene and advice and treatment in the hospital where Austin Roberts was initially transported by helicopter for post-accident medical care.  Other than Dr. Riberty, below, it is not presently known how many employees from this hospital may have been involved in some way with advice about or treatment of Austin Roberts.

h) Dr. Riberty of Vail Valley Medical Center Emergency Room, who provided radioed medical advice regarding treatment of Austin Roberts to Outward Bound employees at the accident scene.  Dr. Riberty is believed to be a Colorado resident.

i) Swedish Hospital in Denver, Colorado, where Austin Roberts was treated for approximately three (3) weeks and where his foot and lower leg were amputated.   It is not presently known how many employees from this hospital may have been involved in some way with advice or treatment of Austin Roberts but the reasonable expectation is that several doctors and a number of nurses and possibly other staff would have been involved in the medical evaluations, decisions and actual procedures and treatments of Austin Roberts at this facility.

5

669162.1

7.  In addition to Austin Roberts, the other students in the subject course included one student each from Colorado, New Jersey, Maryland, New Hampshire, California, Connecticut, North Carolina and Florida.

I declare under penalty of perjury under the laws of California that the foregoing is true and correct.

Executed this 18 day of June, 2008, at Golden, Colorado.


G P Michael Freeman

DECLARATION OF MICHAEL FREEMAN

669162.1

# EXHIBIT "E"

### DECLARATION OF STEVEN R. PARMINTER

I, STEVEN R. PARMINTER, declare as follows:

1.      I am an attorney duly licensed to practice law in the State of California and a partner at the law firm of Wilson, Elser, Moskowitz, Edelman & Dicker LLP, attorneys of record for defendant OUTWARD BOUND, INC.   All of the information contained in this Declaration is within my own personal knowledge and, if called to testify, I could and would give competent testimony thereto.

2.      This declaration is made pursuant to Central District Local Rule 7-3 in support of Defendant Outward Bound, Inc.'s Motion to Dismiss for Improper Venue or alternatively, motion to transfer for improper venue or convenience of the parties and witnesses.

3.      On June 20, 2008, I spoke with plaintiff's counsel Sarina Hinson, telephonically.  I have spoken with Ms. Hinson and with Mr. Biren, the lead counsel for plaintiff, about this case in the past.  During the conversation with Ms. Hinson on June 20, 2008, I confirmed that we would move on behalf of Outward Bound, Inc. to remove this action to federal court on the basis of diversity and to thereafter move to transfer the action to Colorado on the bases of both contract grounds and forum non conveniens.  These are both issues that had been discussed with their office in the past.  Ms. Hinson confirmed they did not expect to obtain authority from their client to agree to removal.  Based on these discussions and representations, the parties could not reach a resolution of the issues that make this motion necessary.

4.      On or about September 26, 2007, in pre-litigation discussions with Mr. Biren, he provided jury verdict information that, assuming liability, he believed supported a value of this case between $2 million to as much a $8.5 million.

1    5.    During my June 20, 2008 conversation with Ms. Hinson, we discussed

2 our joint belief and expectation that, assuming liability, the potential value of this

3 case was in excess of $75,000.00.  We briefly discussed whether there was any

4 possibility that plaintiff might agree this case could or should have a value less

5 than $75,000.00.  Ms. Hinson stated their office would not consider such an

6 agreement.

7    I declare under penalty of perjury under the laws of the State of California

8 that the foregoing is true and correct.  Dated this 23rd day of June 2008.  Executed

9 at Los Angeles, California

10

11

12    Steven R. Parminter, Declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

# EXHIBIT "F"

12 of 391 DOCUMENTS

Copyright 2007 JAS Publications
THE MASSACHUSETTS, CONNECTICUT, RHODE ISLAND
VERDICT REPORTER


ANONYMOUS FEMALE STUDENT V. ANONYMOUS DRIVER AND ANONY-
MOUS EMPLOYERS

Case No. WITHHELD

Settlement Date: January 2006

**TOPIC:** Motor Vehicle Van/pedestrian Accident - Red Light - **Amputation** Juveniles settlement **amputation**

**RESULT:** $ 3,730,000 (settlement)

**INJURY:** Below-the-knee **amputation** of the left leg.

**STATE:** Massachusetts

**COUNTY:** Norfolk County, MA

**COURT:** Superior Court

**PLAINTIFF PROFILE:**  Age: 16
     Sex: Female

**PLAINTIFF ATTORNEY:** Michael E. Mone Jr., Boston;

**DEFENDANT ATTORNEY:** Withheld;

**FACTS:** A teenage girl who required a **leg amputation** following a motor vehicle accident pursued this action against the defendant driver and his employers. Although the defendants denied liability, they agreed to settle plaintiff's injury claim for $ 3,730,000 prior to trial.

The 16 year old plaintiff was standing on the sidewalk, waiting for a bus to take her to school on the morning of April 14, 2003. It was a clear, dry day with no adverse weather conditions. A van driven by defendant driver at a high rate of speed ran the red light at the intersection and collided with another vehicle. The defendant driver's van then struck a traffic light post and the brick wall plaintiff was standing beside. The van then struck plaintiff and pushed her into the wall. She sustained a severe leg injury requiring a below-the-knee **amputation.** Defendant driver was criminally convicted for negligently driving so as to endanger. Plaintiff sought compensation for her injury from the man's employers, a national home service company and its local subsidiary.

Plaintiff alleged defendant employers failed to supervise their employee and were vicariously liable for his actions because he was acting in the course and scope of his employment at the time of the accident. Plaintiff claimed defendant driver was placed on "standby" by his employers' dispatcher and, according to written company policy, was on the clock at the time of this incident. Plaintiff alleged that the van was also outfitted with defendant employers' logo, 800 number and website, and constituted a "moving billboard." She argued permanent disfigurement, permanent injuries and diminution in the quality of her life as a result of her injury.

(c) 2007 JAS Publications, THE MA, CT, RI VERDiCT REPORTER

Defendant driver offered no defense. The corporate defendants argued that defendant driver was not acting within the course and scope of his employment at the time of the accident and they had no liability for his actions. They contended defendant driver was taking family members to

**PLAINTIFF EXPERTS:** Dennis L. Amtower, CPO - Prosthetist/Orthotist Norwood, MA
David M. Blaustein, M.D. - Physiatrist Needham, MA

**EDITOR'S NOTE:** Per plaintiff's counsel, plaintiff was a junior in high school at the date of the accident and graduated on time to a standing ovation from her classmates at the end of her senior year.

Published in Vol. 18, No. 3

36 of 391 DOCUMENTS

Copyright 2002 Williford Information Corporation

BETTY J. NICKLEBERRY, INDIVIDUALLY AND AS NEXT FRIEND OF BOBBIE
WRAY NICKLEBERRY, JR., A MINOR vs. CHARLES YIENG CHU SU, MD,
EMERGENCY SERVICES ASSOCIATES AND LINDA MILLER DULANEY, RN
AND ANONYMOUS HOSPITAL

**Verdict Date:** April 2002

**TOPIC:** MEDICAL MALPRACTICE

**RESULT:** $2,000,000.00

**STATE:** Texas

**COURT:** 101ST JUDICIAL DISTRICT DALLAS COUNTY DALLAS, TEXAS

**JUDGE:** JAY PATTERSON

**PLAINTIFF COUNSEL:** Morgan & Weisbrod from Houston, TX, By: Les Weisbrod

**DEFENDANT COUNSEL:** Schell, Quillin, Mitchell & Cooley from Dallas, TX, By: Edward P. Quillin for physician

**SUMMARY:** On June 1, 2000, Bobbie Nickleberry, a 14-year old male, injured his left knee and left leg while playing basketball, and he was transferred to Defendant unnamed hospital. He was triaged in the emergency department and noted to have +3 swelling, and the pedal pulse was unable to palpate and was faint with Doppler. Defendant Linda Miller Dulaney, RN, an employee of the emergency physician group, took a history from him and completed the **lower extremity** injury form and recorded his condition as stable. Prior to discharge, the ER nurses noted that Plaintiff was unable to move his toes and he was evaluated by emergency physician, Dr. Su. Dr. Su failed to note the neurologic and vascular abnormalities in Plaintiff's leg and Plaintiff was discharged from the emergency room without reassessing the injured extremity. The following day he was taken to another emergency center where he was noted to have markedly abnormal absence of pulses in his left lower leg and he was unable to move the toes of his left foot and unable to dorsi-flex his left ankle. He underwent emergency surgery with multiple repeat procedures and ultimately, on July 7, 2000, underwent a left below-the-knee **amputation.**

**DEFENDANT EXPERT:** George Bone - Vascular Surgery - Dallas, TX; Judy Horton, R.N. - Emergency Nursing - Crowley, TX

**MISCELLANEOUS:** Date of Settlement: 4/2/02 (approx.); File Date: 1/12/01; Plaintiff Information: Betty J. Nickleberry, mother; Bobbie Wray Nickleberry, Jr., 14 yr old male, DOB: 1/26/86

38 of 391 DOCUMENTS

Copyright 2006 JAS Publications
METRO VERDICTS MONTHLY

BEVERLY BASS CHAVOUS, GUARDIAN AD LITEM TO ALANTE MAYBIN, A
MINOR V. THE GEORGE WASHINGTON UNIVERSITY AND LYNNE
SCHOONOVER, MD

Case No. 2003CA00583M

Verdict Date: November 17, 2005

**TOPIC:** Medical Malpractice Medical Malpractice - Double **Leg Amputation** - Strep Sepsis Hospital Negligence

**RESULT:** $ 3,050,000 as to Defendant Schoonover only. Pursuant to a crossclaim credit, the Court reduced the verdict to $ 1,525,000. Defendant George Washington University settled prior to trial. (verdict)

**INJURY:** Strep sepsis that resulted in bilateral **leg amputations** below the knee in order to contain the infection.

**STATE:** District Of Columbia

**COUNTY:** District of Columbia

**COURT:** Superior Court

**JUDGE:** Stephanie Duncan-Peters

**PLAINTIFF PROFILE:**   Age: 6
    Sex: Male

**PLAINTIFF ATTORNEY:** William P. Lightfoot, Washington; Paulette E. Chapman, Washington;

**DEFENDANT ATTORNEY:** Lee T. Ellis, Jr., Washington;

**FACTS:** A 6 year old boy's legs were **amputated** after he developed an infection that was allegedly not diagnosed or treated by defendant physician. The jury deliberated 8 hours before awarding plaintiff $ 3,050,000, which was reduced by the Court to $ 1,525,000. Defendant hospital settled for an undisclosed sum prior to trial.

Plaintiff Beverly Bass-Chavous is Guardian Ad Litem to the child. She replaced Sherry Maybin, the mother of the boy, as plaintiff prior to trial. Defendant Lynne Schoonover, M.D., a pediatrician for Children's Medical Associates in Alexandria, Virginia was taking after hours calls for Defendant George Washington University Hospital pediatrics practice. Ms. Maybin called the after hours line of the pediatrics practice at approximately 6:00 p.m. because her son was exhibiting various flu-like symptoms. She spoke to a certified nurse practitioner, who told her that she should call again if the child worsened. The child slept, but at some point during the night he vomited. Ms. Maybin called the after hours line at approximately 7:20 a.m. Defendant Schoonover returned the call and instructed Ms. Maybin to call the GWU pediatric clinic when it opened and make an appointment to be seen that morning. Ms. Maybin called the clinic at approximately 8:20 a.m. and was told by a nurse to come right in.

Ms. Maybin walked with the sick 6 year old and her infant child to her father's home to get a ride to the GWU pediatric clinic. The father's car was not working, but a neighbor agreed to take them to the clinic. However, they had to wait 30 minutes before leaving. While waiting, the child collapsed. He was taken by ambulance to Children's National Medical Center and diagnosed with invasive sepsis caused by Strep A, a bacteria that had infiltrated his bloodstream. The infec-

(c) 2006 JAS Publications, METRO VERDICTS MONTHLY

tion was attacking the boy's organs and he was in critical condition. During his time at the hospital, a surgeon deter-
mined both legs would have to be **amputated** below the knees, where the

**JURY DELIBERATIONS:** 8 hours

Published in Vol. 18, No. 6

Copyright 2004 West Group
VERDICTS, SETTLEMENTS & TACTICS

Cavender vs. Roe Utility Company

NUMBER NOT PROVIDED

January 7, 2004

**TOPIC:** UTILITIES

**TITLE:** $ 12 Million Settlement In Suit Arising From Electrocution

**RESULT:** $ 12 million settlement, consisting of $ 10,000,000 to Kenneth Cavender, $ 750,000 to Virginia Cavender, and $ 1,250,000 to Kurtis Cavender; The State Of California contributed $ 7,500,000.00, Roe Utility Company contributed $ 4,500,000.00; Structured settlements are being purchased for all plaintiffs.

**INJURY:** Kenneth Cavender had 20% total body surface area burns to the scalp, torso and left **lower extremities.** Status post right below the knee **amputation** secondary to electrocution on November 9, 2002. He was first hospitalized at University Medical Center in Fresno from November 9, 2002 to November 23, 2002. He was then transferred to USC University Hospital from November 23, 2002 until January 3, 2003. He had a total of seven surgeries performed on his right leg, the second of which, was a right above the knee **amputation.** The next five surgeries consisted of allografts, removal of allografts, debridement, dressing change, and revisions to the stump with the last surgery being at Kaiser Permanente on September 4, 2003. He still has not been fitted with a prosthesis.

The Life Care Plan had a present value of $ 8,333,547.00.

No wage loss was contended since Kenneth Cavender was fully disabled and pursuing a workers' compensation claim for lower back surgery as a truck driver and that claim is still pending in Santa Ana, California.

Medical expenses: Kenneth Cavender - $ 413,166.63; Virginia Cavender - $ 158.16; Kurtis Cavender - $ 744.00.

**STATE:** California

**PLAINTIFF ATTORNEY:** Richard C. Watters of Miles. Sears & Eanni, Fresno, California

**DEFENDANT ATTORNEY:** James E. Brown, of Clifford & Brown Bakersfield, California (For Roe Utility Company); Stephen P. Burke, of Sedgwick, Detert, Moran & Arnold, San Francisco, California; State of California Bill Lockyer, Darryl L. Doke, Jason M. Heath,

**SUMMARY:** An electrocution accident occurred on November 9, 2002 on the premises on the Mendota Wildlife Area operated by the California Department of Fish and Game (DFG). Kenneth Cavender, age 50, along with his wife Virginia, age 46, and son Kurtis, age 28, along with three other family members were on the premises lawfully and had paid an entry fee to hunt pheasants. Unbeknownst to them a 12,000 volt power pole had fallen the afternoon before. It was owned by Roe Utility Company. DFG knew of the fallen power pole and had reported it to Roe Utility Company. The pole was not de-energized and in fact the Cavenders were directed by a Warden for DFG to go to the exact field to hunt where the power pole was down. Eventually Kenneth Cavender's dog touched one of the energized power lines and died. Kenneth Cavender then went to his dog and eventually stepped on a power line on the ground and he was electrocuted. His son, Kurtis, an EMT came to his father's aid and saw his father's body smoking. Kenneth Cavender's wife, Virginia, did not see the accident occur but had a cause of action for loss of consortium.

The defendants had a dispute amongst themselves as to the reporting of the downed power pole and what actions were taken. They further contended that Kenneth Cavender was comparatively negligent and hospital records showed that he had ingested methamphetamines and marijuana.

Plaintiffs contended that the DFG maintained a dangerous condition of public property and that Roe Utility Company negligently failed to warn and failed to remedy a down power line and failed to inspect the approximate 50 year old power pole which had broken at its base.

**PLAINTIFF EXPERT WITNESSES:** Robert Armstrong, Ph.D., P.E., Electric Engineer, Armstrong Engineering, Duarte, California; William A. Dost, Wood Technologist, El Cerrito, California; Randall C. Epperson, Ph.D., Neuro-psychologist, Modesto, California; Sharon K. Kawai, M.D. - Physical Medicine & Rehabilitation, Fullerton, California; Raymond C. Kelly, Ph.D., Toxicologist, Tox-Tech, Henderson, Nevada; Hugo Kevorkian, C.E., G.E., Soil Engineer, Bskassociates, Fresno, California; Kenneth R. Laughery, Ph.D. - Human Factors Consultant, Department of Psychology, Rice University, Houston, Texas; Joseph Pohlot - Economist, Ibar Settlement Company, Inc, San Marino, California

**COURT:** Cavender vs. Roe Utility Company, (Fresno County Superior Court, California, Jan. 7, 2004)

**PUBLICATION-DATE:** February 2004

Copyright 2001 JAS Publications
THE MICHIGAN TRIAL REPORTER

CHRISTOPHER KOMMER, DON KOMMER AND LINDA KOMMER V. DOUGLAS ISENGA, MORSE CONTROLS, INC./IMO INDUSTRIES, INC. AND MASTER-CRAFT BOAT COMPANY

Case No. 96-03691-NP

Settlement Date: June 12, 2000

**TOPIC:** Product Liability Product Liability - Boat Controls - **Leg Amputation Amputation** settlement recreation

**RESULT:** $ 2,255,000 settlement. (settlement)

Breakdown: $ 1,500,000 contribution by Morse Controls, $ 750,000 from Mastercraft and $ 5,000 from Isenga.

**INJURY: Amputation** of the leg above the knee and mutilation of the other leg. Emotional distress for plaintiff and parents. Plaintiff was able to walk short distances with a prosthetic device, participates in wheelchair related athletic activities and was recognized nationally for his courage and character after the accident. He utilizes a wheelchair only for long distance walking.

**STATE:** Michigan

**COUNTY:** Kent County

**COURT:** Circuit Court

**JUDGE:** Donald A. Johnson

**PLAINTIFF PROFILE:** Age: 9
Sex: Male
Occupation: Minor
Marital Status: Single

**PLAINTIFF ATTORNEY:** William E. Rohn, Grand Rapids; Elizabeth J. Fossel, Grand Rapids

**DEFENDANT ATTORNEY:** M.J. Stephen Fox, Grand Rapids

**FACTS:** Plaintiff and Defendant families were friends. Plaintiff Christopher was spending a summer day with the Defendant Isenga family at their lake and on their boat. Plaintiff was standing in shallow water when defendant's 2 year old child fell against the boat controls, causing the boat to go in reverse at full throttle and strike plaintiff, pinning him against a dock. Defendant Morse manufactured the controls and Defendant Mastercraft manufactured the 1982 Prostar 170 boat.

Plaintiffs alleged that: (1) the boat control was defective in that there was no neutral control lock; (2) a lock was available at that time; (3) the industry was aware safer controls were needed as evidenced by documents; and (4) defendant manufacturers did nothing despite evidence of potential accidents with the controls.

(c) 2001 JAS Publications, THE MICHIGAN TRIAL REPORTER

Defendants contended that: (1) the controls were state-of-the art and needed for speed boats; (2) the controls met all state and federal safety standards at the time; (3) it was an unforeseeable accident; and (4) Defendant Isenga thought the boat controls were safe.

**PLAINTIFF EXPERTS:** Dror Kopernik - Engineer - Chicago IL
Kenneth Laughery, Ph.D. - Warnings - Houston TX
Dale Morey - Accident Reconstruction - Poynette WI

**INSURANCE:** Self-insured (Morse & Mastercraft)

**EDITOR'S NOTE:** Per counsel, plaintiff child was very credible.

Published in Vol. 13, No. 11, Page 7

Copyright 1993 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

CHRISTOPHER KOMEJKO, PPA, ET AL. vs. QUINCY PEDIATRIC ASSOCIATES, INC.

Case No. 90-0628-C

**Publication Date:** Publication Date: December, 1993

**Topic:** Medical malpractice - Pediatrics - Failure to timely diagnose and treat bacterial infection in two-year-old plaintiff - Spread of infection through bloodstream results in below-the-knee **amputation**

**Result:** $ 6,500,000 verdict

**State:** Massachusetts

**County:** Suffolk County

**Plaintiff Attorney:** William H. Shaughnessy of Boston, Ma.

**Facts:** This action brought against the defendant Quincy Pediatric Associates arose out of the alleged failure to timely diagnose and treat a bacterial infection in the two and one half-year-old male plaintiff. It was contended that the minor plaintiff was seen by pediatricians in the defendant group on five occasions over a two week period for complaints of nausea, vomiting and diarrhea which developed following dental surgery. The plaintiffs contended that the defendants failed to perform diagnostic testing warranted by the circumstances. Timely diagnostic testing would have led to early diagnosis of a bacterial infection, according to the plaintiffs claims, permitting timely treatment and preventing the extensive infection which resulted in a below-the-knee **amputation**. The evidence indicated that from the time of the minor plaintiff's birth until age two and one half, he remained under the care and treatment of the defendant Quincy Pediatrics Associates, Inc. During the fall of 1986, the plaintiff was diagnosed as suffering from "baby bottle syndrome" and was referred to a dentist for dental surgery. Following the dental surgery, the child began experiencing nausea, vomiting and diarrhea and, in the two weeks following the oral surgery, the mother took the child to the pediatricians on five separate occasions. The plaintiff alleged that during those five visits, the minor plaintiff was incorrectly diagnosed as suffering from a viral infection. The minor plaintiff's symptoms continued to worsen and he was eventually diagnosed as suffering from a bacterial infection which had spread throughout his bloodstream, affecting both legs and one arm and, finally, necessitating the **amputation** of a portion of one leg. The plaintiff's expert pediatrician testified that the minor plaintiff received substandard medical care by the defendant group in their failure to diagnose the bacterial infection in light of the symptoms exhibited, which included a depressed white blood count, coupled with the fact that the minor plaintiff had recently undergone oral surgery. The plaintiffs mother and father testified that they specifically requested that their son be prescribed antibiotics, but that the physicians refused based upon their determination that the symptoms were of viral origin. The plaintiff's expert maintained that had the child been properly treated with an appropriate broad spectrum antibiotic, in all medical probability he would not have suffered as extensive an infection as he did and would have been spared the **leg amputation.** The defense experts maintained that the plaintiff was not suffering from a bacterial infection when seen at the defendant group post-surgery and that he was properly diagnosed as suffering from a viral infection or viral gastroenteritis. The defense maintained that the meningococcemia which subsequently developed was unrelated to the treatment the minor plaintiff received at the defendant Quincy Pediatric Associates. The defendant's pediatric disease specialist testified that the defendants complied with acceptable medical standards in all aspects of the care and treatment rendered the minor plaintiff. The defense expert testified that the depressed white blood count shown in the records of the child was unrelated to the subsequent infection of meningococcemia ultimately diagnosed. The defendant additionally called an expert anesthesiologist who maintained that there was nothing that the defendant did or failed to do that resulted in the plaintiff's unfortunate medical result. This expert opined that the men-

© 1993 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis

ingococcemia developed rapidly in the plaintiff and not as a result of neglect on the part of the defendants in treating the child. The defendant's expert pediatrician testified that the need for the **amputation** was caused by the development of meningitoxemia, which developed very rapidly and which the defendants had not negligently failed to diagnose. The plaintiff claimed damages for the loss of his leg resulting from the bacterial infection. The plaintiff underwent multiple surgeries as a result of the infection, including surgeries involving the remaining leg, to correct bone growth complications stemming from the systemic infection. The plaintiff's treating physician testified that the plaintiff would likely require further surgery. The plaintiff's past medical bills totaled $ 57,000. After three days of deliberation, the jury found for the plaintiff and returned a verdict of $ 6,500,000 including $ 6,000,000 pain and suffering, $ 250,000 past special damages and $ 250,000 future special damages.

**Plaintiff Experts:** Plaintiff's pediatrics expert: David Abramson from Washington, D.C.

**Defendant Experts:** Defendant's pediatric disease specialist: Jerome Klein from Boston City Hospital
Defendant's expert anesthesiologist: Michael McManus from the Anesthesia Department of Children's Hospital, Boston
Defendant's expert pediatrician: Sidney Gellis of Newton Center

**Commentary:** The plaintiffs were able to prevail against the defendant pediatric group notwithstanding the impressive assembly of extremely well-qualified medical experts testifying on the defendants' behalf. The jury undoubted reacted negatively to the undisputed evidence demonstrating an impersonal, high volume operation conducted by the pediatric group which resulted in the plaintiff being seen by a different doctor each time he was brought in by his parents. In addition, as noted by the plaintiff's expert, the defendant's record keeping was inadequate. By example, the records documenting the office failed to contain notations of the minor plaintiff's vital signs, including temperature, heart rate, etc., in violation of the Regulations of the Commonwealth of Mass. The plaintiff argued that the poor record keeping prevented the physician who was seeing the minor plaintiff on a particular day, from knowing his exact condition during the previous visit.

**Issue:** Published in Volume 9, Issue 1

Copyright 1993 West Group
VERDICTS, SETTLEMENTS & TACTICS

Cooper v. Sernaque

No. SCC 24197

Date: August 19, 1993

**TOPIC:** MEDICAL LIABILITY

**TITLE:** Physician Found Liable When Patient Developed Compartmental Syndrome Following Vascular Surgery; Patient Incurred **Leg Amputation**

**RESULT:** A jury awarded $330,784 but found plaintiff 40% at fault for a net verdict of $198,470. The award included $80,000 for future general damages.

Plaintiff's motion for additur as to $80,000 for future general damages is pending.

**INJURY:** Compartmental syndrome, necessitating **amputation** of plaintiff's right leg below the knee. Past medical expenses were $15,284; future medical expenses were $105,500; future lost earnings were estimated at $60,000; there was no claim for past lost earnings.

**STATE:** California

**PLAINTIFF ATTORNEY:** Karl W. Schoth of Thon & Beck, Pasadena, Cal.

**DEFENDANT ATTORNEY:** Robert C. Reback of Kirtland & Packard, Los Angeles, Cal.

**SUMMARY:** On July 30, 1988, a 26-year-old unemployed former part-time longshoreman presented to a hospital with gunshot wounds to his right thigh. A physician performed vascular repair surgery. A second surgery was required the next day to deal with the compartmental syndrome that had set into plaintiff's right lower leg. A few days later, plaintiff was transferred to another hospital. Despite attempts to save the **leg, amputation** was eventually required.

Suit was brought against the doctor who performed the vascular repair surgery. Defendant was alleged to be liable for failing to confirm adequate return blood flow after performing the initial surgery, failing to monitor the patient after surgery, and for failing to respond to repeated emergency calls from the hospital nursing staff.

Defendant denied any negligence and contended that plaintiff was comparatively at fault for failing to properly care for the leg after the surgery.

**PLAINTIFF EXPERT WITNESSES:** Michael Kennedy, M.D., vascular surgeon, Mission Viejo, Cal.; Marianne Inouye, economist, Pasadena, Cal.

**DEFENDANT EXPERT WITNESSES:** David Cossman, M.D., vascular surgeon, Los Angeles, Cal.; H. Ronald Fisk, M.D., neurologist, Los Angeles, Cal.

**SETTLEMENT NEGOTIATIONS:** Demand: $175,000. No offer.

**COURT:** Cooper v. Sernaque, No. SCC 24197 (Los Angeles Cty. Super. Ct. Cal. Aug. 19, 1993)

(c) 1993 West Group

**PUBLICATION-DATE:** November 1993

79 of 391 DOCUMENTS

Copyright 1992 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

DANNY M. MOZ vs. KENNETH L. POOLE, INC., ET AL.

Case No. 49192

Publication Date: Publication Date: January, 1992

**Topic:** Motor vehicle negligence - Two truck collision on two lane north/south highway - Alleged improper U-Turn maneuver by defendant truck driver

**Result:** $ 1,313,538.59 verdict including $ 250,000 loss of consortium

**State:** California

**County:** Kings County

**Judge:** Judge Charles F. Hamlin(Retired Justice)

**Plaintiff Attorney:** Carmen A. Eanni of Miles, Sears & Eanni in Fresno, Ca.

**Defendant Attorney:** Paul Auchard of Chinello, Chinello, Shelton & Auchard in Fresno, Ca.
Attorney for intervenor: Larry W. Quan of Laughlin, Falbo, Levy & Moresi in San Francisco, Ca.

**Facts:** This action was brought by the 36-year-old male plaintiff truck driver for injuries suffered as a result of a two-truck collision which occurred on a two-lane North/South highway as the plaintiff was traveling south. The plaintiff contended that collision was caused by the negligence of the defendant truck driver in attempting an improper U-turn maneuver from the northbound lane to the southbound lane. The subject accident occurred on December 1, 1988, on Highway 43, approximately one mile north of Corcoran at approximately 2:00 a.m. under nighttime, foggy conditions. At the location of the accident, Highway 43 is a two-lane, North/South highway. The two lanes are divided by a broken line. There are paved shoulders along the Northbound and Southbound lanes. The two lanes are divided by a broken line. There are no cross streets, access roads or driveways at the location. At the time of the accident, the plaintiff truck driver was operating a 1981 Freightliner Cabover, pulling a 42 foot flatbed trailer loaded with fork-lift equipment. He was proceeding southbound in the southbound lane of Highway 43 towards his home in Corcoran. The plaintiff was operating the truck in the course of his employment with D & H Mid Valley Trucking when the accident occurred. At the same time, the defendant was operating a 1984 Freightliner Truck, pulling an unloaded 45 foot Star bulk load trailer, owned by his employer Kenneth L. Poole Trucking Company. The defendant was also working in the course of his employment at the time of the accident. The plaintiff maintained that the defendant attempted to turn his vehicle from a northbound direction to a southbound direction across Highway 43. The turning maneuver was started from the dirt shoulder east of the northbound lane and the area of the paved shoulder. While in the process of carrying out the turning maneuver and at the time when the defendant's rig was crossways on Highway 43, the defendant's tractor/trailer rig was struck by the plaintiff's truck/trailer rig in the southbound lane of highway 43. A Pontiac Fiero, driven by a witness to the subject accident, struck the defendant's tractor/trailer in the northbound lane of Highway 43 subsequent to the collision between the two trucks. The plaintiff contended that the collision was caused by the negligence of the defendant driver in undertaking an improper turning maneuver on the roadway. The plaintiff's accident reconstruction expert testified that the defendant could not have made the turn in one maneuver as he described in his deposition. He also confirmed that the turning maneuver was unsafe and was the sole cause of the accident, based upon the plaintiff's speed, "lock-up" and the geometry of the impact. The plaintiff's expert further illustrated that the turning vehicle's presentation to oncoming drivers was obscure and disorienting. A second accident reconstruction expert called by the plaintiff testified as to the safe speed for the conditions and maintained that the plaintiff was operating at a safe speed at the time his

© 1992 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis

vehicle locked-up. The expert further confirmed that the plaintiff was delayed in recognizing the hazard because of the place where the maneuver began and the manner in which the turning vehicle was presented to oncoming traffic. The plaintiff's visibility expert confirmed, based upon testing principles, that the plaintiff was confused and deceived by the maneuver which caused a delay in hazard recognition. The maneuver was described by the expert as deceptive, misleading and entrapping to oncoming vehicles. The defendant's liability expert testified that the defendant's turning maneuver was reasonable under the circumstances, since there existed 200 feet of visibility in each direction from the point where the turn was commenced. The defendant's expert further maintained, based upon his calculations, that the plaintiff was traveling at an unsafe speed in view of the conditions. The plaintiff's medical experts testified as to the injuries suffered by the plaintiff including: comminuted, segmented fractures of the left femur; a fracture in the left knee; comminuted, segmented fractures of the left fibula and tibia; and an avulsion degloving injury to the left foot, resulting in **amputation** of the left small toe. The plaintiff's treating orthopedic surgeon testified that the injuries sustained by the plaintiff were the worst **lower extremity** injuries he had ever treated and that he had indicated to the plaintiff that he feared that the leg would be lost. The plaintiff's treating physicians testified that the plaintiff additionally suffered a herniated disc injury to his low back as a result of the accident, requiring a laminectomy at L4-L5. The plaintiff contended that he suffers severe chronic pain in the left leg. The plaintiff's physicians testified that the severe pain is most likely attributable to an injury to the peroneal nerve and the sciatic nerve of the left leg. The plaintiff's physicians maintained that the plaintiff would not be able to work, even at a sedentary position, for more than half a day because of his constant pain, loss of sleep, and inability to sit for more than one half hour at a time. The plaintiff additionally claimed sexual dysfunction as a residual problem stemming from the injuries sustained in the accident. The plaintiff's vocational rehabilitation expert testified that the plaintiff is relegated to sedentary work, with one half day work time capacity, at a significantly reduced hourly income rate. The plaintiff's economist/statistician testified that the plaintiff's past income loss and future loss of earning capacity, with one half day work at limited income offset, amounted to $ 490,700. The defendant's vocational rehabilitation expert testified that the plaintiff could return to work in an occupation that would realize significantly more income than that projected by the plaintiff's experts and physicians. This expert's figures would reduce the plaintiff's past and future lost income to approximately $ 200,000. The plaintiff in intervention, D & H Trucking and California Casualty Insurance Company alleged that as a result of the defendant's negligence, they have been obligated to pay Workers' Compensation benefits, including substantial medical bills, temporary disability and rehabilitation benefits for the purpose of retraining the plaintiff for another occupation. Such lien exceeded $ 102,000. The plaintiff's final settlement demand was $ 570,000. The defendant's final settlement offer was $ 301,000 to the plaintiff and $ 5,001 loss of consortium. The jury found the defendant 100% liable and returned a verdict of $ 1,063,538.59 for the plaintiff and $ 250,000 to the plaintiff's wife for her loss of consortium.

**Plaintiff Experts:** Plaintiff's accident reconstruction experts: David M. Blaisdell from L.A. and George Y. Blair from Fresno
Plaintiff's visibility expert: Vladimir Lieskovsky from Palo Alto
Plaintiff's vocational rehabilitation expert: Ricky Sarkisian from Fresno
Plaintiff's expert economist: Stephanie L. Rizzardi from Pasadena
Plaintiff's orthopedic surgery experts: Dr. Mochizuki from Hanford, Ca. and Dr. McConnaughey from Visalia, Ca.
Plaintiff's physiatrist: Dr. Capell from Fresno

**Defendant Experts:** Defendant's accident reconstruction expert: Ted Kobayashi from Livermore, Ca.
Defendant's orthopedic surgeon: Dr. Minor from Tulare, Ca.
Defendant's vocational rehabilitation expert: Steven D. Koobatian from Visalia

**Commentary:** The testimony of the plaintiff's accident reconstruction and visibility experts was facilitated by their use of scaled diagrams and overlays which enabled the experts to better convey to the jury the basis for their conclusions regarding the alleged danger posed by defendant's turning maneuver, notwithstanding that the turn was undertaken with 200 feet of visibility in either direction, due to the manner in which the turning vehicle was presented to oncoming traffic, creating a deceptive and disorienting picture. In addition to offering their conclusions as to how the accident occurred, the plaintiff's experts, through their calculations, directly refuted the testimony offered by the defendant driver in deposition that he could have made the turn in one maneuver. The significant award found support in the devastating and permanent injuries sustained by the plaintiff, including a left leg injury which was described by the plaintiff's treating orthopedic surgeon as the worst **lower extremity** injury he had ever had occasion to treat. Notwithstanding the severe and permanent nature of the injuries sustained and the fact that the plaintiff suffers daily with chronic, severe pain, the plaintiff did not claim total disability as a result of the accident, but rather, contended that he could work only one

Page 73

© 1992 Jury Verdict Review Publications, Inc., National Jury Verdict Review & Analysis

half day at a sedentary-type job. The jury may have reacted favorably to the fact that the plaintiff was more conservative than he might have been in his lost earning capacity claim.

**Issue:** Published in Volume 7, Issue 2

Copyright 1985 Jury Verdict Review Publications, Inc.
National Jury Verdict Review & Analysis

DAWSON AND CITY OF MILWAUKEE vs. HARLEY DAVIDSON MOTOR CO., ET ALS.

Case No. 601686

**Verdict Date:** Verdict Date: June 7, 1984;

**Publication Date:** Publication Date: December, 1985

**Topic:** Products liability - Police motorcycle with sidecar equipped with inadequate leg guards - Collision results in traumatic **amputation** of leg

**Result:** $ 1,643,562 verdict

**State:** Wisconsin

**County:** Milwaukee

**Judge:** Judge Michael Barron

**Plaintiff Attorney:** s Dawsons: Alan E. Gesler of Warshafsky, Rotter, Tarnoff, Gesler and Reinhardt in South Carolina Attorneys for involuntary plaintiff City of Milwaukee: Robert Cook and William Jennaro of Cook and Franke in Milwaukee

**Defendant Attorney:** Robert E. Cook of Milwaukee

**Facts:** In this products liability action, the plaintiff police officer in his mid 20's contended that the standard leg guards equipped on the Harley-Davidson motorcycle with sidecar, which he was operating at the time of the incident, were inadequate and defective, causing the **amputation** of his left leg when he was struck at an intersection by a left turn driver. As a result of the accident, the plaintiff has undergone four subsequent surgeries and an above the knee **amputation.** The plaintiff offered the results of specific studies performed, testing the Polar Moment of Inertia of the standard Harley-Davidson motorcycle with sidecar, in support of his contention that the standard leg guards are inadequate and unsafe. The Polar Moment of Inertia (PMI), is the resistance of an object to being rotated as it is hit from a certain angle by a certain object at a certain speed. The PMI studies utilized by the plaintiff measured the guard strength necessary to cause the motorcycle to rotate away from a vehicle hitting it which, the plaintiff asserted, is the desired result for passenger safety purposes. The plaintiff maintained that the standard guards were lacking in the necessary thickness and strength indicated by the PMI studies, thus causing the guards in question to crumple under the force of the oncoming vehicle, resulting in the traumatic **amputation** of the plaintiff's leg during the collision. The defendant denied that the vehicle which struck the motorcycle ever came in contact with the leg guard. The defendant alternatively maintained that the standard guard as constructed allows the crumpling of the guard upon impact, which, the defendant contended, is desirable in that it will absorb energy from the impact during a collision and correspondingly slows the speed of the vehicle so that if the operator leaves the motorcycle, he does so at a slower rate of speed, whereas the rigid guard advanced by the plaintiff would effectuate a repeling rotation upon impact, resulting in increased head and chest injuries because the guards would not crumple upon collision and absorb part of the impact energy and the operator would thereby leave the cycle at a greater rate of speed. In support of this contention, that greater head injuries would result, the defendant offered the results of a head injury study done in the 1970's by A.M.F., of which Harley-Davidson was formerly a division, using the Maximum Strength Criteria Index which measures, from ear to ear, head injury related to force delivered. The plaintiff countered that the results of the particular study cited by the defendant were unjustified.

© 1985 Jury Verdict Review Publications, Inc.,National Jury Verdict Review & Analysis

The plaintiff offered testimony from the developer of the Maximum Strength Criteria Index who reported that the defendant's measurements were calculated incorrectly. The plaintiff's expert testified that the study in question erroneously measured the force related to injury on three axes, from top to bottom, ear to ear, and front to back, and then compared the figure derived to the standard index which measures force related to injury on one axis only, from ear to ear. The plaintiff asserted that the defendant's methodology thus resulted in inflated and uninformative comparative statistics. The jury found for the plaintiff and awarded $ 1,643,562.

**Plaintiff Experts:** Plaintiff's expert biomechanical engineer: Verne Roberts, PhD from Durham, N.C.
Plaintiff's expert consulting engineer: Mark Ezra from France

**Defendant Experts:** Defendant's expert consulting engineer: Warner Riley
Defendant's anatomical expert: Peter Fuller, Phd.

**Commentary:** The plaintiff was able to prevail notwithstanding that the leg guard in question was the standard basic leg guard used in all Harley-Davidson sidecar motorcycles. The plaintiff, who was, therefore, required to prove the inadequacy of the basic standard leg guards, made effective use of a physics study which calculated the Polar Moment of Inertia of the standard Harley-Davidson sidecar motorcycle leg guard. The PMI study measured the necessary strength of the leg guards to effectuate what the plaintiff successfully contended was the desired result of rotating the motorcycle away from the colliding vehicle. The results of the study revealed that the standard guard fell short of meeting the necessary strength requirements as determined by the PMI study and the plaintiff was in a position to thereby challenge all such motorcycles as defective. The defendant offered the results of a head injury study using the Maximum Strength Criteria Index which measures, from ear to ear, head injury related to force delivered, in support of its contention that the stronger thicker guards advanced by the plaintiff would cause more severe head injuries because the stronger guard would prevent the crumpling of the guard which would allow greater force of impact upon collision to be transmitted to the motorcycle and which would likely result in the operator leaving the motorcycle at a greater speed. The plaintiff was able to counter this extensive evidence with testimony from the actual developer of the Maximum Strength Criteria Index, which index was the basis for the defense expert's testimony. The plaintiff's expert developer of the Maximum Strength Criteria Index denied that the conclusions from the particular study cited by the defendant were justified. He reported that the study had incorrectly measured the force delivered to the head from the 3 axes of ear to ear, top to bottom and front to back and then compared the results to the standard index which measures the force in one axis only, from ear to ear, thus showing inflated and uninformative results. The damages award basically reflected the **leg amputation** above the knee and four painful intervening surgeries and the fact that the plaintiff was a young man in his mid 20's who, as a result of the accident, was deprived of his ability to function in his chosen occupation as a police officer.

**Issue:** Published in Volume I, Issue 1

Copyright 1998 Jury Verdict Review Publications, Inc.
Florida Jury Verdict Review & Analysis

Doe vs. Smalley, et al.

Case No. 97-04311

**Verdict Date:** September, 1998;

**Publication Date:** December, 1998

**Topic:** AUTO/PEDESTRIAN COLLISION - NEGLIGENT OPERATION OF RENTAL VEHICLE - SEVERE OR-THOPEDIC INJURIES TO PELVIS AND LEFT LEG - BELOW-THE- KNEE SURGICAL **AMPUTATION** OF THE LEFT LEG - AGGRAVATION OF AIDS

**Result:** $ 900,000 (present value) structured recovery

**State:** Florida

**County:** Hillsborough County

**Judge:** Judge n/a

**Plaintiff Attorney:** Wil H. Florin and Thomas D. Roebig of Florin, Roebig, Walker, Huddlestun, Rogers & Brown in Clearwater

**Defendant Attorney:** Attorney for defendant driver: Kenneth C. Whalen of Moody, Strople & Kloeppel in Tampa
Attorney for defendant employer: Francis E. Friscia of Meirose & Friscia in Tampa
Attorney for defendant rental car company: Kathleen T. Hessinger of Harris, Barrett, Mann & Dew in St. Petersburg

**Facts:** The female plaintiff, age 38 at the time of injury, alleged that she was a pedestrian when she was struck by a vehicle negligently driven by the defendant driver and owned by the defendant rental car company. The plaintiff named the defendant driver's employer as a defendant in the case, contending that the defendant was returning from a company function at the time of the accident. The defendant driver argued that the plaintiff was comparatively negligent and that his vision was blocked by a truck in front of him.

On May 13, 1997, the plaintiff was a pedestrian crossing a six lane commercial roadway at approximately 1:30 a.m. in Tampa. When the plaintiff reached the inside westbound lane of travel, she was struck by a vehicle driven by the de-fendant driver and owned by the defendant rental car company. The defendant driver was returning from Orlando where he had been at a business networking function for his employer. The defendant was employed as an assistant branch manager for a surety company.

The plaintiff testified that she recalled absolutely nothing about this incident. The plaintiff contended that the road contained a fair amount of street lighting and was located in a high traffic commercial area where the defendant should have seen the plaintiff crossing.

As a result of the accident, the plaintiff suffered severe orthopedic injuries to her pelvis and left leg, ultimately re-quiring the surgical **amputation** of the left leg below the knee. In addition, the plaintiff claimed that the accident aggra-vated her Acquired Immune Deficiency Syndrome (AIDS) requiring additional treatment and hospitalization for the condition.

© 1998 Jury Verdict Review Publications, Inc.,Florida Jury Verdict Review & Analysis

The defendant testified that he was driving within the legal speed limit and had three drinks at diner and a business reception between 6:00 p.m. and 9:30 p.m. that evening, the last drink being consumed about three hours prior to the accident.

This testimony was substantiated by witnesses who were in attendance at the function with the defendant driver. The defendant driver testified that he did not see the plaintiff until she was in his windshield. Evidence showed that the road was dry and that the weather was clear. The defendant claimed that he was deterred from observing the plaintiff due to a truck traveling in the middle lane which created a blind spot, preventing him from seeing the plaintiff. The defense also claimed that the plaintiff was comparatively negligent in crossing the street in a wandering fashion, not at a cross walk and in a shadowed area while under the influence of cocaine and barbiturates.

The defendants argued that the plaintiff had sustained no lost wages due to her having already been totally disabled by AIDS prior to the accident and was not gainfully employed at the time. The plaintiff had been HIV positive since 1985.

The case was settled at a Court-ordered mediation conference for a total present value of $ 900,000. The settlement included a lump sum payment of $ 800,000 to the plaintiff and an annuity purchased for an additional $ 100,000 for payments to the plaintiff's 14-year-old son, with a guaranteed payout of $ 335,000 for a total settlement package of $ 1,135,000. The defendant rental car company paid $ 172,500 of the settlement with the defendant driver and his employer paying the remainder including the annuity purchase.

**Commentary:** Both the damages and liability portions of the plaintiff's case were complicated by the circumstances surrounding this early morning auto/pedestrian accident. The plaintiff had been diagnosed as HIV positive in 1985 and was already disabled from employment. Additionally, she had a complete lack of memory as to how the accident occurred and there was evidence that she was under the influence of cocaine and barbiturates at the time. It may have been difficult to select a jury without some bias against the plaintiff, given the nature of her apparent lifestyle. On the other hand, the seriousness of the plaintiff's injuries were difficult to challenge, having sustained a surgical **leg amputation** and severe orthopedic injuries. The plaintiff's negotiated health care and hospital liens totaled $ 78,985 (which will be paid from the settlement funds) indicating the magnitude of her injuries. Another factor in the plaintiff's favor was the admission by the defendant driver of having consumed at least three drinks on the night in question and the fact that the plaintiff had already crossed several lanes of travel before she was struck by the defendant's vehicle.

**Issue:** Published in Volume 8, Issue 12

Copyright 1992 Law Bulletin Publishing Co.
Wisconsin Jury Verdicts

E.K. v. Arlington Mutual Ins Co.

**Case No.** 91CV 198

**Date of Publication:** October 1, 1992

**TOPIC:** SETTLEMENT - **LEG AMPUTATION** CASE.

**RESULT:** Guilty

**AWARD:** $ 450,000

**STATE:** Wisconsin

**COUNTY:** Dane

**COURT:** 5th Judicial District

**PLAINTIFF(S):** E.K.

**DEFENDANT(S):** Arlington Mutual Ins Co.

**PLAINTIFF ATTORNEY(S):** Curtis Kirkhuff

**DEFENDANT ATTORNEY(S):** In-house counsel for defendant

**SUMMARY:** The plaintiff here was only twenty-two months old and in her father's barn when her leg got caught in the "barn cleaner." It was traumatically **amputated** below her knee and attempts at re-attachment were unsuccessful. Throughout her childhood she will need a new prosthesis every one to two years, and one every two to three years after she gets a little older. It is also likely she will need some stump revision at some future point in time. Her past medical damages came to approximately $40,000-$50,000. No product liability claim was thought possible and so the only claim pursued was against her parents for negligent supervision. Her grandfather had, apparently, only just recently transferred the farm to her father and so the insurance policy over the farm was still in her grandfather's name and thus what is described to us as the "usual" exemption of liability for injuries to immediate family of the policy holder did not apply. The policy limits of same was for $500,000, though the settlement here was for $450,000. No payment was made upon any subrogated medical expense interest.

**ISSUE:** Vol. 3, Issue 5, Case Ref. No. 1

100 of 391 DOCUMENTS

Copyright 1986 Texas Reporter-Soele's Trial Report

EDDIE WINNON vs. THE CHARLES MACHINE WORKS, INC. AND VALLEY
DITCH WITCH, INC.

Case No. 82-190-8-B

**Verdict Date:** May 12, 1986

**TOPIC:** PRODUCT LIABILITY

**RESULT:** Settled before trial for approximately $400,002.57.  Plaintiff, a single man without dependents, had suffered several heart attacks.  Plaintiff died of heart failure within sixty (60) days following settlement.

**INJURY:** Left leg of Plaintiff **amputated** at the mid calf level.

**SPECIALS:** In excess of $125,000.00.

**STATE:** Texas

**COURT:** Nueces County

**PLAINTIFF COUNSEL:** Tinsman & Houser, Inc. - By: Bruce M. Miller.

**DEFENDANT COUNSEL:** Brin & Brin, P.C. - By: George Brin for The Charles Machine Works, Inc. (Corpus Christi, Texas); Law Offices of Guy Allison - By: Paul Raleigh for Valley Ditch, Inc. (Corpus Christi, Texas)

**SUMMARY:** Allege that a Ditch Witch Model 1500 trenching machine, designed and manufactured by The Charles Machine Works, who subsequently sold the trenching machine to Valley Ditch Witch, Inc., suddenly and without warning entrapped Plaintiff's left foot by the digging chain, drawing the foot into a ditch where the Ditch Witch inflicted serious and painful permanent injuries on the **lower extremity** of the Plaintiff.

**DEMAND:** Actual: Two Million. Exemplary: Two Million.

Case 2:08-cv-04130-JFW-E   Document 1   Filed 06/23/08   Page 61 of 73   Page ID #:61

107 of 391 DOCUMENTS

Copyright 1998 Texas Reporter-Soele's Trial Report

ELSA LOPEZ ON BEHALF OF THE ESTATE OF JESUS PALACIOS, DECEASED
vs. HOSPITALITY HOUSE, INC. & REHABILITY HEALTH SERVICES, INC., D/B/A
REHABILITY CENTER

Case No. 96-089-34918

**Verdict Date: May 1998**

**TOPIC:** NURSING HOME - DECUBITUS ULCERS - **LEG AMPUTATION**

**RESULT:** Case settled with Rehability Center for $150,000.00; with Hospitality House for $390,000.00.

**INJURY:** Right **leg amputation** below the knee

**SPECIALS:** $30,000.00 approx.

**STATE:** Texas

**COURT:** 79th Jim Wells County Alice, Texas

**PLAINTIFF COUNSEL:** Law Offices of George W. Mauze, II, PC from San Antonio, TX, By: George W. Mauze, II; Law Offices of Michael Stuart Lee & Associates, PC from San Antonio, TX, By: Michael S. Lee

**DEFENDANT COUNSEL:** Liddell, Sapp, Zivley, Hill & LaBoon, LLP from ?????, TX, By: Kim Olsen; Christovich & Kearney, LLP from Houston, TX, By: Thomas C. Cowan & Patrick Drouilhet

**SUMMARY:** Jesus Palacios was a resident at Hospitality House, Inc.'s facility. While a patient there, and under the physical therapy care of the Rehability Center, Jesus Palacios had a pressure sore on his right heel progressively worsen until it became Stage IV, and became infected. This necessitated **amputation** of his right leg below the knee. Mr. Palacios died from unrelated complications approx. 2 years later.

**PLAINTIFF EXPERT:** Joe Gene Gonzalez, M.D. - San Antonio, TX; Blossom Cowan, RN, BS - Austin, TX; S. Francis Scholl, MSN, RN, CS - Dallas, TX

**DEFENDANT EXPERT:** Christine Hall, RN, BSN, ET - Plano, TX; Frances Guerrero, RN - San Antonio, TX; Malcolm Lancaster, M.D. - San Antonio, TX; Daniel Tamez, Jr., M.D. - San Antonio, TX; John C. Cianca, M.D. - Houston, TX; Carole Sussman, PT - Torrance, CA

131 of 391 DOCUMENTS

Copyright 2005 JAS Publications
METRO VERDICTS MONTHLY

FRED A. SPECHT, JR. V. JUBILEE ASSOCIATES OF MARYLAND AND EM-
PLOYEE/DRIVER

Case No. N/A

Settlement Date: November 17, 2004

**TOPIC:** Motor Vehicle Motorcycle/auto Accident - Right-of-way - Turning Motorcycle settlement **amputation**

**RESULT:** $ 1,975,000 (settlement)

**INJURY:** Above-the-knee **leg amputation** and torn rotator cuff which was inoperable. Plaintiff had restricted range of motion in his arm and was totally disabled from working as a result of his injuries. He sought $ 3,300,000 in damages.

**STATE:** Maryland

**COUNTY:** Montgomery County, MD

**COURT:** Circuit Court

**PLAINTIFF PROFILE:**   Age: 51
  Sex: Male
  Occupation: Car Mechanic
  Marital Status: Married

**PLAINTIFF ATTORNEY:** Eugene M. Zoglio, Bowie;

**DEFENDANT ATTORNEY:** None;

**FACTS:** Liability was undisputed in a motorcycle/auto accident in Montgomery County. Plaintiff's injuries resulted in an above-the-knee **leg amputation** and he documented damages of $ 3,300,000. Defendant disputed only the extent of damages and settled plaintiff's claim for $ 1,975,000 out of a $ 2,000,000 policy.

Plaintiff Fred Specht was operating his motorcycle on Good Hope Road. An employee of Defendant Jubilee Associates of Maryland was operating a vehicle in the opposite direction of the plaintiff. Defendant's employee made a left turn into a driveway in front of plaintiff's oncoming motorcycle. Plaintiff attempted to avoid the accident by laying his bike down, but nonetheless struck defendant's vehicle. He suffered severe leg injuries, resulting in an above-the-knee **amputation.** He also suffered a torn rotator cuff, which was inoperable.

Plaintiff alleged that he suffered disabling injuries as a direct result of this accident. Plaintiff presented evidence of $ 3,300,000 in damages.

Defendant did not dispute plaintiff's injuries or liability, just the extent of damages plaintiff claimed.

**INSURANCE:** Guide One

Published in Vol. 17, No. 5

133 of 391 DOCUMENTS

Copyright 1998 West Group
VERDICTS, SETTLEMENTS & TACTICS

FRICCHIONE v. JACOBS

Case No. 106914/95

December 9, 1997

**TOPIC:** MEDICAL LIABILITY

**TITLE:** Settlement In Suit Alleging Negligent Cosmetic Surgery And Failure To Diagnose Compartment Syndrome

**RESULT:** $ 2.5 million settlement. Out of the total settlement of $ 2.5 Million, the sum of $ 500,000.00 was structured. Dr. Jacobs and St. Luke's-Roosevelt contributed $ 2.2 million; Dr. Pelham contributed $ 300,000.00 to the settlement.

**INJURY:** Above the knee **amputation.**

Plaintiff did not have any lost earnings. However, his future medical expenses include replacement of the prosthesis every two years; the present cost for the prosthetic replacement is $ 25,000.00. With the exception of seeing a neurologist on a yearly basis, the plaintiff is not presently under active medical care.

**STATE:** New York

**PLAINTIFF ATTORNEY:** Sherri L. Plotkin of Barton & Zasky, New York, N.Y.

**DEFENDANT ATTORNEY:** Robert J. Cecala of Aaronson, Rappaport, et al., New York N.Y. (for Dr. Jacobs and St. Luke's-Roosevelt); Michael H. Bernstein of Sedgwick, Detert, Moran & Arnold, New York, N.Y. (for Dr. Pelham).

**SUMMARY:** On September 7, 1994 the then 24-year-old plaintiff was admitted into St. Luke's Roosevelt Hospital Center for calf augmentation by means of bilateral silicone implants. Plaintiff was a body builder seeking to enhance his appearance. The surgery was to be performed by defendant Dr. Brad Jacobs, who was the Chief Resident in the Plastic Surgery Department at defendant Hospital; the co-defendant Dr. Francis Pelham was the attending physician. The expected hospital stay was one night.

Due to the development of post-operative complications including an inability to wiggle the toes of his right foot and diminished pulses in his right **lower extremity,** the plaintiff remained hospitalized one additional day and was discharged on September 9, 1994.

The plaintiff's condition continued to deteriorate over the next several days, with increasing, excruciating pain, numbness, swelling, an inability to walk and his right foot started to turn blue.

Plaintiff contended that he called Dr. Jacobs several times to document his complaints and Dr. Jacobs basically told the plaintiff it was normal post-operative pain and to deal with it. The plaintiff finally returned to the emergency room at St. Luke's Roosevelt Hospital on September 14, 1994 at which time Dr. Jacobs was summoned. Upon seeing the dire condition of the right leg, Dr. Jacobs immediately rushed the plaintiff into surgery and removed the implants on an emergency basis. At that time, there was a complete absence of pulses in the right **lower extremity** and the compartment pressures were 27 cm of water in the right anterior compartment and 75 cm of water in the right posterior compartment (normal readings are between 3 and 4 cm of water), evidencing a severely damaged leg.

Dr. Jacobs did not request a vascular consultation during this surgical procedure. Subsequently, when a vascular consultation was done, the plaintiff was taken back to the operating room for additional surgery consisting of a 4 point fasciotomy in an effort to save his right leg (fasciotomies were done on both legs). However, his right leg was too badly damaged to save it and the plaintiff's parents were advised that **amputation** would be necessary.

Due to a lack of confidence in defendants, plaintiff was transferred to Hackensack Medical Center where initially, a below the knee **amputation** was performed; however, due to the extensive damage the following day plaintiff was again operated on for additional **amputation** above the knee. The plaintiff presently wears a full leg prosthetic.

It was plaintiff's contention that the defendants were careless and negligent in that they performed the calf augmentation surgery in an improper manner (Dr. Jacobs had only performed this type of surgery on 2 prior occasions); in using silicone implants that were too large for the plaintiff's body frame and size (two implants were placed in each calf); and in failing to timely diagnose and treat compartment syndrome which was allowed to progress, unchecked, to the point that an above the knee **amputation** was required.

It was defendants' contention that the plaintiff had lied regarding prior steroid use (i.e., defendants claimed that plaintiff said he had stopped using steroids several months before the surgery, when in fact he had used steroids shortly before the surgery); and that defendants had instructed plaintiff to return to the hospital when he had first called with post-operative complaints, but plaintiff refused to return to the hospital on a timely basis.

**COURT:** Fricchione v. Jacobs, No. 106914/95 (New York Cty. Sup. Ct. N.Y. Dec. 9, 1997)

**PUBLICATION-DATE:** February 1998

Copyright 2006 Jury Verdict Review Publications, Inc.
New Jersey Jury Verdict Review & Analysis

GARCIA vs. BOWEN

Docket No. PAS L-835-03

**Verdict Date:** September, 2006;

**Publication Date:** December, 2006

**Topic:** DEFENDANT TRUCK DRIVER IN THE COURSE OF MAKING DEVLIERY TO PAPER RECYCLING PLANT NEGLIGENTLY FAILS TO OBSERVE PLAINTIFF WORKER IN TRUCK BAY BEFORE TRAVELING IN REVERSE - PLAINTIFF PINNED BETWEEN BACK OF TRAILER AND LOADING DOCK WALL - SEVERE ANKLE FRACTURE - BELOW-THE-KNEE **AMPUTATION**

**Result:** $ 750,000 Recovery

**State:** New Jersey

**County:** Passaic

**Judge:** n/a

**Plaintiff Attorney:** Jeffrey M. Bloom of West New York

**Facts:** This action involved a plaintiff forklift operator at a paper recycling plant in which the plaintiff contended that after he had completed loading pallets onto the defendant's trailer, the defendant, who had begun driving out of the truck bay, suddenly traveled in reverse when the rubberized "chock" supplied by the employer became caught under the wheel. The plaintiff, who had jumped approximately four feet from the loading dock to unload an adjacent trailer, contended that the defendant negligently failed to see him as he traveled in reverse some 20 to 30 feet, pinning him between the rear of the trailer and loading dock wall. The plaintiff contended that he suffered severe crush fractures to the ankle and that after an unsuccessful attempt to save the foot, he required a second and third surgery, ultimately undergoing a below-the-knee **amputation.** The triangular shaped rubberized chocks are placed under the wheels of the trailer to prevent it from rolling during the loading and unloading process. The plaintiff's trucking expert would have contended that the chocks are designed in such a manner that a tractor trailer could easily travel over it if it become caught under the wheel and that the trucker violated several Federal safety standards. The plaintiff maintained that the defendant driver nonetheless negligently attempted to free the trailer by traveling a short distance forward and then in reverse and negligently failed to make observations as he was doing so. The plaintiff maintained that as the defendant traveled in reverse, co-workers began screaming and that he attempted to quickly climb back up the wall, but was pinned by the truck. The plaintiff's witnesses would have testified that the plaintiff was pinned up against the wall for 15-20 seconds before the defendant driver realized that the accident had occurred.

The defendant would have argued that the plaintiff was clearly comparatively negligent in opting to avoid having to walk the short distance to an adjacent stairway to enter the truck bay and by taking the short cut of jumping down into the bay. The defendant contended that had the plaintiff followed safe procedures, he would not have been in a position of jeopardy. The plaintiff would have argued that the physical and emotional pain and suffering during the incident was clearly horrific. The evidence also revealed that despite the initial surgery and two follow-up surgeries, the leg could not be saved. The plaintiff maintained that fitting him with a proper prosthetic device proved to be a very painful and difficult process. The plaintiff was ultimately able to be fitted with a prosthesis. The plaintiff contended that he will permanently suffer extensive pain and difficulties ambulating. The evidence reflected that although the plaintiff can no longer operate a forklift or engage in strenuous physical work, he has been retained by the employer in a more sedentary role,

© 2006 Jury Verdict Review Publications, Inc., New Jersey Jury Verdict Review & Analysis

working on a part-time basis. The employer would have testified that the plaintiff had always been an unusually dedicated and reliable employee. The plaintiff would have indicated that because of his people and translation skills, he would always be considered productive and offered to work even if he was limited to a totally sedentary role. The employer would have testified that currently, the plaintiff's duties include acting as a liaison between the employer and driver's of other companies.

The evidence would have disclosed that although the plaintiff is currently earning a higher hourly wage than before the accident, he now works only approximately 20 hours per week. The plaintiff's economist would have projected approximately $ 300,000 in future lost wages. The defendant trucking company, a Canadian corporation, had apparently ceased doing business and plaintiff's counsel relates that neither the trucking company nor the driver could be located. The case settled prior to trial for $ 750,000.

**Plaintiff Experts:** Trucking: John Anderson from Richfield, OH
Orthopedic Surgeon: Edwin Teehan
Orthopedic Surgeon: Robert Hole
Specialist in Physical Rehabilitative Medicine: Bruce Pomerantz from Kessler Institute in West Orange, NJ
Economist: M. Marcus from Scotch Plains, NJ

**Commentary:** The defendant would have contended that the primary cause of the incident was the negligence of the plaintiff, who chose to take a shortcut into the truck bay by jumping down from the four-foot loading dock, rather than walking the short distance to the steps that led to the bay, arguing that had he done so, he would have been much more visible to the defendant driver and the accident probably would not have occurred. It is thought that the nature of the case involving a worker who was attempting to perform his duties would tend to render a jury much less receptive to such a defense argument, and that when the fact that the plaintiff was working was combined with the evidence of such a highly traumatic event in which the plaintiff was crushed between the back of the trailer and the loading dock, suffering severe fractures that ultimately led to a below-the-knee **leg amputation,** the chances of a very strong jury reaction were very substantial.

The defendant had $ 1,000,000 in insurance coverage. Plaintiff's counsel relates that the trucking company, a Canadian company, had apparently ceased doing business, had no assets, and neither the trucking company nor the defendant driver could be located. If present, these defendants, who would ordinarily be expected to advise the carrier that unless the carrier resolved the case within the policy limits, the carrier was subjecting them to the possibility of an excess verdict. It is felt that their absence insulated the carrier from the prospect of a bad faith claim, which, upon an excess verdict, would generally be assigned to the plaintiff from the defendants, and enabled the carrier to settle the case below the limits of the policy.

**Issue:** Published in Volume 27, Issue 7

141 of 391 DOCUMENTS

Copyright 2003 JAS Publications
METRO VERDICTS MONTHLY

GEORGE GILL V. AZEB TELAHUN, M.D., ET AL.

Case No. CAL01-09514

Verdict Date: January 16, 2003

**TOPIC:** Medical Malpractice Medical Malpractice - Diabetes Diagnosis - **Leg Amputations Amputation**

**RESULT:** $ 5,100,000, including $ 800,000 for pain and suffering. (verdict)

**INJURY:** Delay in diagnosis of diabetes resulting in below knee **amputation** of right leg, left great toe **amputation** and several lengthy hospitalizations. Plaintiff is 6'8" tall and his rehabilitation has been extremely slow and difficult.

**STATE:** Maryland

**COUNTY:** Prince George's County, MD

**COURT:** Circuit Court

**JUDGE:** Steven I. Platt

**PLAINTIFF PROFILE:** Age: 48
  Sex: Male
  Occupation: Massage Therapist
  Marital Status: Married

**PLAINTIFF ATTORNEY:** Bruce J. Klores, Washington; Lesley S. Zork, Washington;

**DEFENDANT ATTORNEY:** David A. Roling, Annapolis;

**FACTS:** A massage therapist who had his right leg and a toe on his left foot **amputated** due to diabetes was awarded $ 5,100,000 against an ophthalmologist group which treated him for cataracts.

Plaintiff George Gill, a 47 year old massage therapist, presented to defendant ophthalmologist group for treatment of cataracts. Lab studies were performed three times during a four-month period and plaintiff underwent four surgeries on his eyes during that time. All three lab reports showed markedly elevated blood glucose levels. Eighteen months later, plaintiff developed sores on his right foot for which he sought treatment with another physician and was diagnosed with diabetes. The sores failed to heal properly, resulting in **amputation** of plaintiff's right leg below the knee and **amputation** of his left great toe.

Plaintiff alleged that the type of cataracts, his age and the three elevated blood sugars, should have raised a strong suspicion of diabetes. Plaintiff alleged that the defendants breached the standard of care by failing to inform him of the likelihood of diabetes or to refer him to a physician for medical management. Plaintiff also alleged that defendants should have postponed cataract surgery until after the diabetes was diagnosed and treated. Lastly, plaintiff claimed that the defendants' negligence resulted in a 20 month delay in diagnosing the diabetes, which was the proximate cause of his damages.

Defendants contended that they told plaintiff repeatedly to see a physician and that plaintiff refused.

(c) 2003 JAS Publications, METRO VERDICTS MONTHLY

Plaintiff's counsel reported that hospital records for the cataract operations indicated that plaintiff's health was excellent at the time of his admissions and that the office chart was devoid of a referral except for one undated and unsigned entry in the margins.

**PLAINTIFF EXPERTS:** Harry A. Hamburger, M.D. - Ophthalmologist Miami, FL
Michael A. Brownlee, M.D. - Diabetes Specialist New York, NY

**DEFENDANT EXPERTS:** Christopher D. Saudek, M.D. - Internist Baltimore, MD

Published in Vol. 15, No. 7

# EXHIBIT "G"

1  Laura L. Horton, SBN 158990
   Patrick Bollig, SBN 248255
2  **HORTON & DEBOLT LLP**
   9301 Oakdale Avenue, Suite 220
3  Chatsworth, California 91311-6515
   Telephone: (818) 407-0700
4  Facsimile: (818) 407-0705
   e-mail: laura@horton-debolt.com
5
   Attorneys for Specially Appearing Defendant
6  Outward Bound International, Inc.

7

8

9                    **UNITED STATES DISTRICT COURT**

10                  **CENTRAL DISTRICT OF CALIFORNIA**

11

12  AUSTIN ROBERTS, a Minor, by and          No. CV08-04130 CAS(CWX
    through his Guardian ad Litem, TIMOTHY
13  ROBERTS,                                 Los Angeles County Superior Court,
                                             Case No. BC389358
14                 Plaintiff,                [Complaint filed on April 18, 2008]
                                             Related Case No. EC045248
15          v.                               [Complaint filed on July 12, 2007, dismissed w/o prejudice
                                             January 11, 2008]
16  OUTWARD BOUND WILDERNESS,
    INC.; OUTWARD BOUND
17  INTERNATIONAL, INC.; and DOES 1          **DECLARATION OF IAN R. WADE IN**
    through 100,                             **SUPPORT OF JOINDER IN NOTICE OF**
18                                           **REMOVAL OF ACTION**
                   Defendants.
19

20

21          I, IAN R. WADE, declare as follows:

22          1.     I am the Executive Director of Outward Bound International Inc. (hereinafter

23  "OBI.") OBI has been named as a defendant in this litigation.  I have personal knowledge of the

24  facts stated in this declaration, and if called as a witness, I could and would competently testify

25  thereto.

26          2.     I make this declaration in support of defendant Outward Bound, Inc.'s (hereinafter

27  "OB-USA") removal of this lawsuit to the United States District Court, Central District, the action

28  entitled *Roberts v. Outward Bound, Inc. et al.* (LASC Case No.BC389358; and the related

HORTON & DEBOLT LLP
9301 OAKDALE AVENUE, SUITE 220
CHATSWORTH, CA 91311
TEL. (818) 407-0700

002                                      1
                         DECLARATION OF IAN R. WADE

# PROOF OF SERVICE

## STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California, by WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP and am over the age of 18 and not a party to the within action.  My business address is 555 South Flower Street, Suite 2900, Los Angeles, California 90071.

On June 23, 2008, I served the foregoing document described as **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441 [28 U.S.C. § 1332 (DIVERSITY OF CITIZENSHIP)** on all interested parties, through their respective attorneys of record in this action, by placing [___] the original [X] a true copy thereof enclosed in a sealed envelope addressed as follows:

## SEE ATTACHED SERVICE LIST

__X__   **(BY MAIL)** I caused such envelope(s) fully prepaid to be placed in the United States Mail at Los Angeles, California. I am "readily familiar" with the firm's practice of collection and processing correspondence or mailing.  Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

___   (State) I declare under penalty of perjury that the above is true and correct.

x   (Federal Court) I declare that I am employed in the office of a member of the bar of this court at whose discretion this service was made.

Executed on June 23, 2008 at Los Angeles, California.

_____
Diane Gonzales

595221.1

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SERVICE LIST**
*Austin Roberts, et al. vs. Outward Bound, et al.*

Matthew B.F. Biren, Esq.
Sarina M. Hinson, Esq.
Biren/Katzman
11911 San Vicente Boulevard
Suite 140
West Los Angeles, California 90049-6617
Telephone: (310)476-3031; Fax (310)471-3165
Attorneys for Plaintiffs

Laura L. Horton, Esq.
Patrick Bollig, Esq.
Horton & Debolt LLP
9301 Oakdale Avenue
Suite 220
Chatsworth, California 91311-6516
Telephone: (818)407-0700; Fax (818)407-0705
Attorneys for Specially Appearing Defendant
Outward Bound International, Inc.

595221.1